THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDWIN EILERS *et al.,* Defendants-Appellants.

(No. 58715;

First District (5th Division)—March 1, 1974.

*Rehearing denied April 8, 1974.*

Paul Bradley, Deputy Defender, of Chicago (Martin Carlson, Assistant Appellate Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Barry Rand Elden, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, both defendants were found guilty of rape and sentenced to terms of from 4 to 12 years. On appeal defendants contend: (1) the trial court erred in refusing to allow the defendants to testify regarding matters essential to their defense; and (2) the evidence was insufficient to establish their guilt beyond a reasonable doubt.

At trial, the following evidence was adduced: Mary Anne Kantorski testified for the State that on February 18, 1971, at 1:30 A.M., she left her home to make a telephone call from the phone booth next to an unlighted gas station at 31st and Halsted. She was carrying her radio and was trying to call a radio station disc jockey but got a busy signal. As she left the phone booth, Michels grabbed her arm, put an 8-inch knife to her throat and said, "Don't make a sound or I'll kill you." Eilers grabbed her other arm and put his hand over her mouth and both men pulled her down an alley and into a shed where Michels stood at the door, and Eilers then ordered her to take off her clothing. When she refused, Eilers knocked her down and pulled off her slacks, socks and underpants. Eilers attempted to have intercourse with her but was unable to do so because of her struggles. He then forced her to perform an act of oral copulation, after which he ordered her to put on her clothing. She got dressed but could not find her socks or underpants. An object then was put into her back, and one of the men said it was a gun and ordered her not to turn

around or they would kill her. They took her to a first-floor rear apartment where she was pushed into a bedroom and ordered to take off her clothing. When she refused, one of the men put a knife to her throat and she then removed all of her clothing. Eilers again and then Michels attempted to have intercourse with her but were unable to do so because of her struggling. Eventually, after several hours, both Eilers and Michels forced her to have intercourse with them, and then she was released about 5:00 A.M. after they threatened to kill her and her family if she told the police. She went to the home of Rose Garno, her cousin, and told her that she had been raped, and they went to a police station to report the incident. The police took her to a hospital, where she was examined. The police also went with her to the shed, where they found her socks and underpants.

Rose Garno, the cousin of Mary Anne, testified for the State that on February 18, 1971, about 5:00 A.M., Mary Anne came to her home. Her hair was messed, her clothing dirty, and her eyes were bloodshot and full of tears. She said that she had just been raped by two men.

Maurice Sullivan, a Chicago police investigator, testified for the State that on February 18, 1971, he was assigned the investigation of an attack on Mary Anne Kantorski and went to the apartment of Michels, where he arrested defendants and found a set of knives and a bedsheet which he took with him.

James W. Kessler, a Chicago police officer, testified for the State that on February 18, 1971, Mary Anne came into the police station and reported she had been raped. He accompanied her to the phone booth at 31st and Halsted, where he found a key chain and personal items belonging to her. Inside a shack down the alley he found a pair of socks and panties, which the complainant identified as belonging to her. He testified that earlier, on February 18, 1971, at about 1:00 A.M., he and his partner responded to a disturbance call and went to the area of 31st and Halsted. Defendants were in a group there but, to his knowledge, they were not searched at that time.

Fredrick Michels, defendant, testified that in the early morning of February 18, 1971, he was in a restaurant at 31st and Halsted with Eilers and several other men when an argument developed between two men who went outside, where a fight ensued. He and Eilers went out to break up the fight, and when the police arrived defendant and others were searched. He denied having a knife or gun in his possession. Later he and Eilers met Mary Anne as she left a phone booth at 31st and Halsted, and when they asked her where she was going, she stated that she was going to a restaurant on 35th Street. He and Eilers went with her to a shed where Eilers started kissing her. He went home, and about 10 or

15 minutes later Eilers came to his apartment with her and the two of them went into the bedroom. When Eilers came out he went in and had intercourse with her, after which she dressed and all three talked and had coffee. Later she and Eilers left the apartment together. He denied threatening her at any time.

Edwin Eilers, defendant, testified that early on February 18, 1971, he was at a restaurant at 31st and Halsted with Michels when Officers Kessler and Rinkenberger came to the scene of a fight. They were searched, but no weapons were found on their persons. Eilers testified they then met Mary Anne as she left a phone booth at 31st and Halsted, and they asked her where she was going and whether she would come with them. She agreed to go with them to Michels' house and, as they were going through the alley, they observed a shack with the door open and Eilers said, "Let's go in there." She agreed, and all three entered the shack where he and she started necking, and Michels left, Eilers testified that he then left with her, and they went to Michels' apartment, where he had intercourse with her in the bedroom. He denied at any time having a weapon or threatening her in any manner. After about 1 hour he left the bedroom and Michels then went into the bedroom and remained with her for approximately one hour. Later all three stayed in the kitchen where they talked, and he then left the apartment and walked with her to 31st and Emerald.

Chicago Police Officer Rinkenberger testified for the State that on February 18, 1971, he responded with Officer Kessler to a disturbance at 31st and Halsted, where he observed defendants, but they were not placed under arrest or searched.

*OPINION*

## I.

Defendants initially argue that the trial judge erred in refusing to allow them to testify concerning matters essential to their defense. They point out that their defense was grounded solely on the consent of the complaining witness, and they contend that the trial judge should have allowed Eilers to testify concerning her reputation in the community for unchastity.

■■ Reputation testimony is admissible as an exception to the hearsay rule where the defense to the charge of rape is consent. *People v. Cieslak*, 319 Ill. 221, 149 N.E. 815.

■■ Defendants call our attention to the fact that the trial judge sustained objections to each of the following questions which were asked of Eilers either on his direct or redirect examination (some of which were answered before the objection was made):

"* * * Q. What is Mary Anne Kantorski's nickname, if you know? A. From what some of my friends told me—

* * *

Q. Do you have any knowledge as to what Mary Ann Kantorski's reputation is in the neighborhood?

* * *

Q. Do you know any other persons that in fact knew this Mary Anne Kantorski? A. Yes, sir.

* * *

Q. Do you know whether or not Mary Anne Kantorski has a reputation in the neighborhood as to the truth or veracity?

* * *

Q. Does Mary Anne Kantorski have a reputation in the community of which you reside for chastity?

* * *

Q. Do you have any friends in the neighborhood who in fact know Mary Anne Kantorski?

* * *

Q. Have you ever discussed Mary Anne Kantorski with any people that live in your community? * * * A. Yes."

We note that each of these questions inquires concerning present reputation, and we were unable to determine from the record any effort on the part of defendants to establish any reputation for unchastity prior to the acts charged. The underlying thought with respect to reputation testimony in rape cases is that it is more probable that an unchaste woman would assent than would a virtuous woman but, in any event, the evidence must be confined to general reputation or chastity *before the acts charged* (*People v. Allen,* 289 Ill. 218, 124 N.E. 329); and even then only after a proper foundation is laid. (*People v. Hankins,* 90 Ill.App.2d 51, 234 N.E.2d 104.) Here, the stated questions did not inquire concerning the reputation of complainant before the acts charged and, inasmuch as her reputation thereafter was not an issue, the questions called for information having no relevance, and the trial judge was correct in sustaining the objections thereto. Furthermore, because no offer of proof was made concerning the excluded reputation testimony, we believe that the issue is not properly preserved for review (*McMahon v. Coronet Insurance Co.,* 6 Ill.App.3d 704, 286 N.E.2d 631), and we disagree with the contention of defendants that the exception to the rule requiring an offer of proof should be applied here. As expressed in *People v. Moretti,* 6 Ill.2d 494, 520, 521, 129 N.E.2d 709, the exception is as follows:

"[I]f a question shows the purpose and materiality of the evidence, and if it is in proper form and clearly admits of an answer relative

to the issues, the party by whom the question is propounded is not bound to state the facts proposed to be proved by the answer unless the court requires him so to do."

Here, we believe the questions do not show the materiality of the evidence, and as we have already concluded that the questions called for answers not relevant to the issues, we believe the exception, as expressed in *Moretti,* does not apply.

■■ Defendants also assert because the trial judge sustained an objection, on the ground of hearsay, to testimony of Michels concerning a conversation with the complaining witness as she emerged from the telephone booth. This testimony would not be hearsay, because it was offered to show that the complainant made certain statements which had relevance concerning the defense of consent. (*People v. Carpenter,* 28 Ill.2d 116, 190 N.E.2d 738.) However, we note from the record here that Michels, on cross-examination, testified concerning this conversation at the phone booth and that Eilers not only testified to the conversation but also to their conduct at the phone booth. We have not been informed, nor does it appear from the record, by offer of proof or otherwise, that any part of this conversation was not related. It has long been established that the rejection of evidence is not prejudicial where substantially the same evidence is admitted at some stage of the trial. (*People v. Moretti,* 6 Ill.2d 494, 529, 129 N.E.2d 709.) Here, the evidence having subsequently been admitted, no prejudicial error resulted from its initial refusal.

## II.

Finally, defendants argue that the charges were not proven beyond a reasonable doubt. They maintain that the version of complainant as to what happened was totally implausible, and they point to specific portions of complainant's testimony; namely, her statement that she left her parents' home at 1:30 A.M. to call a disc jockey from a street phone booth; that when she was released at 5:00 A.M., she went to her cousin's home rather than her own; that she left home with a radio, which was later unaccounted for; that she said that the restaurant across from the phone booth was closed, and the police officers said it was open; that she was abducted at knife-point in plain view of the open restaurant; and that she never saw the gun allegedly put to her back. Defendants contend that this testimony, considered with the fact that they did not conceal their identities at any time, and because the Michels apartment, where the acts charged occurred, was within a few blocks of the phone booth and of complainant's home, leaves her total testimony completely unworthy of belief.

The State, in replying thereto, lists instances where her testimony was

corroborated; namely, the implausibility of the voluntary sexual activity in the shack, which was admittedly filthy and debris-strewn; the fact that items knocked from her purse during her struggle were found by the police the next day near the phone booth; the fact that some articles of clothing which she stated were ripped off by Eilers in the shack and which she could not find when she was told to dress were found the next day by the police; the fact that immediately after she was released she went to her cousin's home and told her she had been raped by two men; the fact that a knife, identified by her as the one used by Michels was found in his apartment the next day.

■■■ Reviewing courts are charged with a special duty of carefully examining the evidence in rape cases. (*People v. Qualls*, 21 Ill.2d 252, 171 N.E.2d 612.) However, unless this court is able to find that the evidence is so unsatisfactory as to leave a reasonable doubt of the guilt of defendant, the finding of the trial court will not be disturbed. (*People v. Hampton*, 44 Ill.2d 41, 253 N.E.2d 385.) And the fact that the evidence at trial has been conflicting will not in itself justify a reversal of the finding of the trier of fact. (*People v. Hiller*, 7 Ill.2d 465, 131 N.E.2d 25.) We have carefully reviewed the record, and we cannot say that the evidence is so unsatisfactory as to leave a reasonable doubt as to the guilt of defendants.

For the reasons stated, we affirm the judgment of the trial court.

Affirmed.

DRUCKER and BARRETT, JJ., concur.