THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN ELLISON, Defendant-Appellant.

Second District   No. 82—578

Opinion filed April 24, 1984.

Michael M. Melius, Public Defender, of Waukegan, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, John Ellison, and a codefendant, Tom Siefert, Ellison's brother-in-law, were indicted in the circuit court of Lake County for the offenses of home invasion and rape. (Ill. Rev. Stat. 1981, ch. 38, pars. 12—11, 11—1(a)(1).) The cases were severed for trial, and Siefert was not involved in this appeal. The defendant was convicted by a jury for both offenses and he was sentenced to serve concurrent 12-year terms.

On appeal, the defendant raises these issues: (1) whether the omission of the words "without authority" from the home-invasion indictment was fatal to the indictment; (2) whether the rape shield statute is unconstitutional; (3) whether admission of evidence of his prior offense of impersonating a police officer was an abuse of the court's discretion; (4) whether admission of his prior conviction for burglary for impeachment purposes was an abuse of the court's discretion; and (5) whether he was proved guilty beyond a reasonable doubt.

During the early morning hours of December 18, 1981, after stopping at several neighborhood taverns, the defendant and Siefert were driving in Round Lake Beach in search of another place to stop. They noticed the lights were still on at Kristof's, a lounge and bowling alley, and they stopped, but the place had just closed.

Brenda Wicinski, a bartender at Kristof's, testified her car had stalled in the parking lot, and would not start again. She testified that the defendant, whom she did not then recognize, approached her, said he was a cop, showed her a badge, and motioned for her to move her car to an area which was like a dead-end alley located between Kristof's and J & W Auto Parts. A police car passed them at that time, without stopping, and she told the defendant she would move as soon as her car warmed up. Siefert then approached the car, and was recognized by Wicinski. The defendant said to Siefert, "You know her?" and then returned to his own car. Defendant testified his only purpose in using the badge and pretending to be a cop was to "have a little fun."

After driving about four blocks from Kristof's, the defendant testified he noticed a light on at the prosecutrix' apartment, whom he knew, and he decided to stop. At that time it was about 3:30 a.m. The defendant testified that he knew the prosecutrix because they worked together at Ozite. Also, he had dated her best friend, Roxanne Burdick, who also worked at Ozite. The defendant was married and had two children. He testified that he knew Roxanne considered him to be her boyfriend, but he stated he did not really like her. He did like the prosecutrix, and testified they had had intercourse twice within three or four months prior to the date in question.

The prosecutrix testified she and the defendant had not ever arranged to meet for a date, but that on one or two occasions he would arrive at a place where she already was and they would have a drink together or go out for pizza. Defendant and the two women often went to Roxanne's house after work to talk, drink, and, according to the defendant, smoke marijuana. Roxanne testified at trial that she was not upset that the defendant had stopped seeing her, and that she was seeing someone else. There was testimony about a statement made by Roxanne to her union steward at Ozite in which she referred to the prosecutrix as "that slut," indicating she had seen her and the defendant at a bar. Roxanne also stated the defendant was "going to be sorry." The statement was made at a time when the prosecutrix and Roxanne were estranged due to an incident involving some money taken from Roxanne for which she blamed the prosecutrix.

Prior to December 18, 1981, Roxanne and the prosecutrix had reconciled and the prosecutrix considered her to be her best friend. The prosecutrix also had told the defendant she did not want to see him anymore because he caused too much trouble between her and Roxanne. She asked him to leave her apartment on this occasion, and she slammed the door in his face. The defendant testified this occurred about two weeks before December 18. The prosecutrix testified she had met Tom Siefert only once before; the defendant testified that she had met him perhaps two or three times. She did not realize who Siefert was until after the men had left her apartment and she was on her way to Roxanne's.

According to the prosecutrix' testimony concerning the event in question, a man whom she did not recognize until later as Tom Siefert, knocked on her door, displayed a badge, and said he was looking for prowlers. After she let him in, he walked around the apartment, turned lights on and off, and a second man came running through the doorway when the lights were off. She tried to run out of the apartment, but the second man, later identified as the defendant,

pulled her down to the floor, choked her with his arm across her throat and then made her walk into the bedroom. The prosecutrix testified the defendant held her down as Siefert got on top of her; that he wandered around while Siefert was with her; and that he then had intercourse with her also. The prosecutrix claimed that she did not begin to recognize who the defendant was until he was having intercourse with her. When she addressed him by name, he yelled back that he was not John, "and this guy John, whoever he was, that [she] should treat him better from now on."

The defendant testified that he first knocked on the prosecutrix' door. The light that had been on was turned out by then, but he could hear the stereo playing. After he went downstairs again, and Siefert went upstairs, he testified he waited until he noticed that the lights came back on and saw that Siefert had entered the apartment. He testified he did not know that Siefert used the badge to gain entrance. Defendant testified that when he entered the apartment, Siefert and the prosecutrix were already in the bedroom. When the defendant demanded to know what was going on, Siefert angrily pushed him out of the bedroom, causing him to fall backwards against the living room couch. Defendant and Siefert loudly exchanged words. Siefert turned the stereo up loud, and returned to the bedroom where the prosecutrix was. The defendant observed them having intercourse. He testified that the prosecutrix' arms and legs were up around Siefert.

In her testimony, the prosecutrix stated that Siefert "kept on telling me to moan and to get in different positions, and he was pulling my hair." When she failed to follow his directions, "he pushed [her] legs right on him," and threatened her with anal intercourse.

The defendant testified that after Siefert came out into the living room, the prosecutrix said, in a sarcastic way, "I suppose it's your turn now." The defendant said he "wasn't feeling no pain," and so he did not see anything wrong with it. In contrast to the prosecutrix' testimony that she pushed him away, the defendant testified she did not do anything. "She just laid there" and did not react. The defendant testified he had intercourse with her for about five minutes, and then started feeling kind of sick about the whole idea of her just having been with Siefert, so he got off her. Siefert then reentered the room stating that he would handle her, got on top of her again, and she tried to push him away. When the defendant tried to pull Siefert off the prosecutrix, Siefert took a swing at him and the defendant left the apartment. Siefert eventually came downstairs, got in the car, and they left.

The prosecutrix' neighbor, Karen Divoky, whose bedroom was adjacent to the prosecutrix', testified that on the evening in question she heard the prosecutrix scream, and then heard voices of two men and the prosecutrix' voice, as if there was arguing back and forth. She also heard furniture crashing as if fighting were going on. She stated the stereo was then played very loudly. She testified that she discussed calling the police with her husband, but decided not to because she thought it was a couple who visited the prosecutrix.

After the defendant and Siefert left the prosecutrix' apartment, she did not seek help at the Divokys nor at the police station which was located about one block away from her apartment. Instead, she went immediately to Roxanne's house where she was urged by Roxanne and her mother to call the police.

Several employees of Ozite who knew both Roxanne and the prosecutrix testified that neither one had a good reputation for truthfulness or veracity. A previous offer of defense counsel to have these witnesses testify to the prosecutrix' reputation for chastity was denied by the court on the basis that it was contrary to the rape shield statute. Evidence of the defendant's prior conviction for burglary was admitted. The defendant also testified to an incident which occurred before trial in which Roxanne had driven her car near the jail, and taunted him to come out and play.

### HOME INVASION

■■ ■ Based on the authority of *People v. Pettus* (1980), 84 Ill. App. 3d 390, and *People v. Medreno* (1981), 99 Ill. App. 3d 449, the defendant contends the failure of the home-invasion indictment to allege the fundamental element that the defendant acted "without authority," and his timely raising of the issue in his post-trial motion, necessitates the reversal of his conviction for that offense.

The State disagrees, asserting that the omission of the words "without authority" was a formal, not fatal, defect. The State asserts the allegation that the defendant was not a peace officer "strongly implies" his lack of authority to enter, and contends no reversal is warranted where no prejudice to the defendant in the preparation of his defense has been shown. The State urges the court to reject the authority of *Pettus* and *Medreno*, and to recognize that lack of authority is implicit in the very nature of the offense of home invasion since invasion means that it is without authority. The State argues: "It is also indicative that the criminal intent was present *ab initio* since interpreting the statute any other way would render meaningless the portion requiring the defendant's

knowledge of the victim's presence."

The State argues that entry with knowledge of a person's presence therein is meaningful only if the entry is made with the intent to threaten or harm the person, and since no one would invite an entry for that purpose, it necessarily follows the entry is unauthorized. The State's argument is not well taken.

The offense of home invasion consists of two parts: the knowing unauthorized entry of an occupied dwelling place of another and the use or threat of force by the invader while armed with a deadly weapon or intentional injury by the invader upon an occupant. The offense is committed when both parts of the statute are satisfied. (*People v. Robinson* (1980), 89 Ill. App. 3d 211, 214.) In the face of a due process attack on the statute for the reason no intent to do an unlawful act at the time of entry was required, the *Robinson* court stated: "No constitutional provision requires that the legislature include criminal intent at the time of entry in the offense of home invasion. (See, e.g., *People v. Ruberg* (1979), 76 Ill. App. 3d 671, 395 N.E.2d 205.)" 89 Ill. App. 3d 211, 214.

The cases cited by the defendant in support of his position on this issue are dispositive: *People v. Pettus* (1980), 84 Ill. App. 3d 390, and *People v. Medreno* (1981), 99 Ill. App. 3d 449. As the *Pettus* court likewise noted, the requirements that a charge be in writing and set forth the nature and elements of the offense charged are mandatory and not directory. (Ill. Rev. Stat. 1981, ch. 38, par. 111—3(a)(3); *People v. Troutt* (1977), 51 Ill. App. 3d 656.) As stated in *Pettus*:

> "In our view, the allegation of 'without authority' is fundamental to the offense. Without it, one is left only to speculate as to the status of the defendant, whether he be an invitee, or has entered the premises by error, or in some legal capacity. If any of the latter be true, then the offense would become some form of aggravated assault or battery.
>
> &ast; &ast; &ast;
>
> [T]he failure to allege such status is fatally defective to an information." *People v. Pettus* (1980), 84 Ill. App. 3d 390, 393.

Citing *People v. Lutz* (1978), 73 Ill. 2d 204, the *Medreno* court found:

> "Because this defect is fatal to the charge, the defendant need not demonstrate that the defect prevented him from understanding the nature of the charge and preparing a defense thereto, as the State alleges." *People v. Medreno* (1981), 99 Ill. App. 3d 449, 455.

The defendant here specifically amended his post-trial motion to

include the allegation that "the indictment is deficient on its face." The State did not object to the amendment, and both parties argued the point during the post-trial hearing. Although the issue would more properly have been raised in a motion in arrest of judgment under section 116—2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 116—2), an allegation included in a post-trial motion which concerns the sufficiency of the charging instrument has been construed as a motion in arrest of judgment. (*People v. Pettus* (1980), 84 Ill. App. 3d 390, 392.) We conclude the same construction should be afforded the defendant's post-trial motion here.

It is also well established that a trial court errs in denying a motion in arrest of judgment when the indictment omits an essential element of the offense charged. (*People v. Miller* (1983), 116 Ill. App. 3d 361, 368; *People v. Medreno* (1981), 99 Ill. App. 3d 449, 455.) Accordingly, we conclude the defendant's conviction and sentence for home invasion must be vacated. See *People v. Pruden* (1982), 110 Ill. App. 3d 250, 254.

### CONSTITUTIONALITY OF THE RAPE SHIELD STATUTE

◼ The defendant argues the rape shield statute is unconstitutional as an abrogation of his sixth amendment right to present a full and fair defense to the charge of rape. His reference is to section 115—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—7). That section provides:

"a. In prosecutions for rape or deviate sexual assault, the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused.

b. No evidence admissible under this Section shall be introduced unless ruled admissible by the trial judge after an offer of proof has been made at a hearing to be held in camera in order to determine whether the defense has evidence to impeach the witness in the event that prior sexual activity with the defendant is denied. Unless the court finds that such evidence is available, counsel for the defendant shall be ordered to refrain from inquiring into prior sexual activity between the alleged victim and the defendant."

He further asserts the statute conflicts with the original legislative intent of the Illinois legislature. He requests this court to find the statute unconstitutional and to grant him a new trial.

The State points out, correctly so, that numerous Illinois decisions have affirmed the rape shield statute, citing *People v. Cornes* (1980),

80 Ill. App. 3d 166, *People v. Siefke* (1981), 97 Ill. App. 3d 14, *People v. Buford* (1982), 110 Ill. App. 3d 46, *People v. Requena* (1982), 105 Ill. App. 3d 831, and *People v. Bachman* (1981), 92 Ill. App. 3d 419. The *Cornes* and *Buford* cases specifically considered the constitutionality of the statute in the context of the defendant's right of confrontation, and *Bachman, Seifke,* and *Requena* cited *Cornes* as precedent.

The defendant attempts to avoid the effect of this precedent by distinguishing these cases. He asserts the cases misinterpret the legislative intent, are inconsistent with *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, and/or should be considered precedential only where the victim's testimony is corroborated.

It is true, as the State suggests, that the legislature speaks through its enactments, and that resort to legislative history is necessary only when a statute is vague or ambiguous and clarification of the underlying legislative intent is needed. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141.) Under the statute, it is clear the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the prior sexual conduct of the alleged victim with the accused. (Ill. Rev. Stat. 1981, ch. 38, par. 115—7(a).) Therefore, resort to extrinsic construction aids is not necessary.

However, when such reference is made to the House and Senate debates prior to passage of the statute, defendant's contention that the statute does not reflect legislative intent cannot be accepted. It is true the first draft of House Bill No. 760 would have allowed admission of evidence relating to a victim's general reputation for chastity (the Senate amended "chastity" to "sexual promiscuity") in the discretion of the court after an *in camera* hearing. So, technically, it is true the final draft of the statute does not reflect the legislature's original intent; it does, however, reflect its current intent.

After the bill passed the House and Senate and was sent to the Governor, the Governor issued an amendatory veto message in which he noted the restriction of the evidence to conduct only between the victim and the accused was necessary to conform the statute to prior case law. The House overwhelmingly supported the Governor's amendatory veto, which amended the statute to read as section 115—7 currently does. (155 ayes, 7 nays, 3 present.) (Record of Proceedings, 80th General Assembly, Regular Session, Motion to Concur in Amendatory Veto on House Bill 760, at 59 (November 3, 1977).) The Senate likewise overwhelmingly accepted the Governor's amendment. (39 ayes, 8 nays, 1 present.) Report of Proceedings, 80th General Assembly, Regular Session, Motion to Accept the Specific Recommendations of the Governor as to House Bill 760, at 10 (November 22,

1977).

Of note is a statement by Senator Washington, who was the movant to accept the Governor's recommendations:

> "The issue here is did defendant X rape the prosecuting witness, that's the case, period, and there's all kinds of testimony which could be permitted. Now, if he takes the defense of consent then in camera out of hearing of a jury he can present any such evidence which bore upon the fact that he may have had prior sexual conduct with her. But I find just impossible to understand how past sexual conduct is relevant at all to the case. I don't think...and that's why the Governor has...has amended the bill in this fashion. I agree with this amendment. The House agreed with this amendment. We've had any number of hearings in the Rape Study Committee which brought out that other jurisdictions do a similar thing as this and there's been no injustice brought or lack of due process insofar as these defendants are concerned."

As evidenced by the vote, clearly a majority of the Senators concurred in the substance of that statement.

Prior to 1978, evidence of the victim's past sexual conduct was admissible when the defendant claimed consent as an affirmative defense limited, however, to the victim's general reputation for such conduct before the alleged rape. (See, *e.g.*, *People v. Fryman* (1954), 4 Ill. 2d 224; *People v. Eilers* (1974), 18 Ill. App. 3d 213.) Specific acts of promiscuity were not admissible. *People v. Fink* (1978), 59 Ill. App. 3d 51; *People v. Collins* (1962), 25 Ill. 2d 605.

In his letter to the House of Representatives, Governor Thompson expressed his feeling that the bill as originally passed by the General Assembly was a small step in the right direction, but that it was his belief that a giant stride in that direction was desirable. In his judgment, neither the victim's prior sexual activity nor her reputation should ever be inquired into in a rape case unless she was previously involved with the alleged rapist. (See Comment, *The Illinois Rape Shield Statute: Privacy At Any Cost?* 15 J. Mar. L. Rev. 157, 164 (1982).) Although the author of that article, and the defendant here, suggest that the history of the rape statute shows it does not reflect the "original legislative intent," nevertheless, the bill passed overwhelmingly in the General Assembly, and the language of the statute is clear. In view of the absence of distinguishing circumstances, this court is bound by the principle of *stare decisis* to follow the lead of *People v. Cornes* (1980), 80 Ill. App. 3d 166, and its progeny.

As pointed out by the State, the defendant here was able to

present his theory of defense to the jury, thus distinguishing this case from *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105. In *Davis*, the court determined the defendant had been deprived of his right of confrontation because he was prohibited from making any reference to the fact that the witness who had identified him in the lineup was on probation. The defendant was charged with breaking into a bar and removing its safe. The safe was later found near the home of the witness. The witness was a juvenile, and the court had granted a pretrial protective order, pursuant to an Alaska statute, which prohibited the defense from making any reference to the juvenile witness' probationary status. The defendant claimed this unconstitutionally restricted his right to cross-examination in that it made it impossible to show that the juvenile witness, a convicted burglar, might have been subject to coercive police questioning which may have caused him to identify the defendant and testify against him. At trial, the witness denied he felt any concern that the police might suspect him of the burglary of the safe, rather than the defendant. Without knowing the witness had any possible motive for testifying against the defendant, the jury in that case could well have thought that defendant's counsel "was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness ***." *Davis v. Alaska* (1974), 415 U.S. 308, 318, 39 L. Ed. 2d 347, 355, 94 S. Ct. 1105, 1111.

According to the record here, defense counsel attempted to question the prosecutrix regarding what she and the defendant and Roxanne did on the occasions the three of them went to Roxanne's house after work. The State's objection to the question was sustained, and counsel indicated to the court his intent was to establish the prior sexual relationship between the defendant and the prosecutrix. The court then held a hearing in chambers. At that time, defense counsel stated the defendant would testify that he had sexual intercourse with the prosecutrix on two prior occasions within approximately three to four months before the incident in question. Counsel also stated if the prosecutrix denied ever having been out alone with the defendant, that he had impeachment witnesses who would testify they saw the two of them together.

Later, counsel sought reconsideration of the court's earlier ruling granting the State' pretrial motion *in limine* regarding the victim's sexual experience or reputation for sexual activity. Defense counsel stated the impeachment witnesses could "also testify as to the reputation of the victim as far as chastity." The court denied the motion to reconsider.

After trial, defendant filed a motion to confirm that a sufficient offer of proof was made at the time of trial as to the prosecutrix' reputation for chastity or lack of same, and the court confirmed the sufficiency of the offer of proof. The defendant's motion alleged in pertinent part:

"3. That each witness was further prepared to testify that:

a. They also knew other members in the community;

b. They were aware of the prosecutrix' reputation for chastity among those other members of the community;

c. [The prosecutrix'] reputation for chastity was bad whereby she had been referred to as a slut, whore, tramp and other such epithets, referring to her lack of virtue."

We note the defendant did present witnesses who testified that the prosecutrix' reputation for truth and veracity was bad. Witnesses also testified Roxanne Burdick's reputation for truth and veracity was bad.

In deciding whether the defendant's right of confrontation was denied, the *Davis* court applied the due process test developed in *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038. There, it was held that the constitution requires that the competing interests of the defendant's right of confrontation and the State's public policy for enacting the rule be closely examined and a balance struck. If the State's exclusionary policy does not outweigh the defendant's need for the evidence, the policy of exclusion must yield.

The State policy underlying the rape shield statute, at least ostensibly as expressed in *People v. Cornes*, is to prevent the defendant from harassing and humiliating the prosecutrix at trial with evidence of either her reputation for chastity or specific acts of sexual conduct with persons other than the defendant, since such evidence has no bearing on whether she consented to sexual relations with the defendant. Further, exclusion of such evidence keeps the jury's attention focused only on issues relevant to the controversy at hand. Last, but not necessarily least, the exclusion promotes effective law enforcement because victims can report crimes of rape and deviate sexual assault without fear of having the intimate details of their past sexual activity brought before the public.

In our opinion, the defendant's need for the excluded evidence has not been clearly shown. He states it was "crucial to the jury's understanding of this incident in a proper context." He argues this case is distinguished from *Cornes* and *Buford* where there were corroborating witnesses, because the case here "boiled down to the

word of the prosecutrix against [his]," and that it was the prosecutrix' testimony alone that established all of the elements of rape.

The defendant's argument ignores all the evidence which corroborated the prosecutrix' testimony, such as the physical condition of her apartment (*i.e.*, disconnected phone cord, position of the couch consistent with her version of the struggle, testimony of the neighbors who were awakened by yelling and loud noises); the physical condition of the prosecutrix herself as testified to by the examining physician, Roxanne Burdick, and one of the responding police officers; and her prompt complaint to her best friend, Roxanne Burdick. Defendant's argument also ignores the fact the jury was instructed as to his accountability for the rape of the prosecutrix by Tom Siefert. The defendant testified the first words he heard the prosecutrix say to Siefert were "to leave her alone and to get out," and she told the defendant she did not want Siefert near her. The defendant admitted on cross-examination that he saw some of the things Siefert had done to the prosecutrix, but he did not do anything to stop him, at least not until later.

On balance, we believe the interests of the State which are promoted by the rape shield statute far outweighed the defendant's purported need to cross-examine the prosecutrix concerning her reputation for chastity.

In sum, we conclude the rape shield statute did not deprive the defendant of his right of confrontation, and reversal is not warranted.

### EVIDENCE OF OTHER OFFENSE

The defendant asserts the court erroneously allowed admission of the testimony of Brenda Wicinski concerning his use of a badge to impersonate a police officer earlier on the date in question. He argues the evidence that he approached her and displayed a badge to her in order to get her to move her car was not sufficient to establish either his intent or design to commit rape, and it should not have been admitted. He claims the only purpose of such evidence was to persuade the jury of his bad character and propensity to commit a crime. He points out the offense of impersonating a police officer and the offenses with which he was charged were not even the same type of crimes. Referring to the State's argument that the badge incident was relevant to show identity, intent and design, the defendant asserts his identity was clearly proved by other evidence, including his own stipulation that it was he who showed the badge to Wicinski. Thus, he analogizes the case to *People v. Triplett* (1981), 99 Ill. App. 3d 1077, in which case the court reversed and remanded on the basis

of erroneously admitted evidence of the defendant's prior armed robbery of a different Clark gas station. The evidence there was offered to show common design and *modus operandi* and to show the defendant's knowledge of the Clark station procedures. The *Triplett* court found the defendant's familiarity with station procedures was clearly and irrefutably established by other evidence; therefore, its probative value was outweighed by its prejudicial effect. Further the dissimilarities between the prior offense and the charged offense negated its value in showing any common design or *modus operandi.*

The State contends the evidence was properly admitted to show the defendant's intent, design, *modus operandi* and identity as to both the rape and home-invasion charges. In support, it cites *People v. McDonald* (1975), 62 Ill. 2d 448, 455, wherein it was found:

"Evidence which tends to prove a fact in issue is admissible though it may be evidence showing that the accused has committed a crime other than the one for which he is being tried, and evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi* is admissible though it may show the commission of a separate offense. [Citations.] In fact it has been broadly held that evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime. [Citations.]"

The State distinguishes the *Triplett* case, asserting the evidence of the prior offense there was unnecessary to show the defendant's knowledge because there was testimony by other witnesses as well as the defendant himself. Introduction of evidence of the prior offense in that case was superfluous; it added nothing to the State's case against the defendant. The State also notes there were fewer similarities between the two offenses in that case, and greater time and distance differences. Further, although the defendant's identity in this case was established by his own testimony, nevertheless it was also relevant to show design, *modus operandi*, and intent as to both the offenses, not just the rape offense.

Alternatively, the State argues if it was error to admit the evidence, it was harmless in view of the other ample evidence in the record and the fact the prior offense was not of the type likely to have inflamed the jury or prejudiced it against the defendant.

During the pretrial hearing on the defendant's motion *in limine* to exclude this evidence, the facts concerning the impersonation offense and the method of entry of the prosecutrix' apartment were described to the court as follows:

"[A]t approximately 3:30 a.m. on December 18th, [prosecutrix]

was awakened by a knock on her door. She went to the door of her apartment, looked through a window in the door, saw a person she did not recognize at that time who later would be identified as Thomas Siefert; that Thomas Siefert showed her a badge, identified himself as a police officer, told her that he was looking for—they were having problems in the area. He wanted to come into her apartment and take a look.

She opened the door and let him in.

He came in the apartment, walked around a little bit, flipped lights on and off.

After he turned the living room lights off, the defendant John Ellison then came in through the door of the apartment, and [the prosecutrix] would also testify that she knows John Ellison, had known him for approximately one year prior to that time, and that after—

When he came in, or shortly after he came in, he had his coat over his head, and the apartment was dark.

As far as Brenda Wicinski, she would testify that shortly after 3:00 a.m. on the 18th of December, she left work at Kristof's, which is in Round Lake Beach, which is located approximately four blocks from the residence of [the prosecutrix], and that after she left work, her car stalled almost right in front of her place of employment, still within four blocks of [the prosecutrix'] home.

Her car stalled. While she was there with her car, she was approached by the defendant John Ellison, whom she did not know at that time; that he showed her a badge, told her he was a police officer, and told her to—she had to move her car, and told her to move it into a driveway which was—if she had parked her car where he told her to, it would have been blocked on the front and on either side by buildings.

She informed him that she had already spoken to a Round Lake Beach police officer who told her she didn't have to move her car; she could stay there.

She then saw Thomas Siefert, whom she did know, and when she saw him, she recognized him and said, 'Hi, Tom.'

The defendant stayed and talked to her for a couple of minutes and then left.''

In argument, the prosecutor pointed out the common denominators, aside from identity, were the use of the badge; the time (one-half hour to 45 minutes) and place (four blocks) proximity; the same two defendants involved; in each instance, the defendant who knew the

woman stayed back out of sight while the defendant who either did not know or who was less able to be recognized by the woman, approached her, displayed the badge, and announced he was a policeman. The court agreed the evidence was admissible, both as to the time and area and *modus operandi*, and denied the defendant's motion to exclude it at trial.

■ We find persuasive the State's argument that the evidence of the offense of impersonation was admissible as tending to prove the defendant's unauthorized entry into the prosecutrix' apartment as well as her lack of consent to intercourse. The defendant contended at trial he did not know how Tom Siefert got into the apartment, and that he used the badge with Brenda Wicinski just to have "a little fun." The striking similarity of the method of the use of the badge in each instance by both defendants tends to negate the existence of any innocent intent. (See *People v. Bartall* (1982), 105 Ill. App. 3d 867.) Although time and place proximity alone is an insufficient basis for permitting evidence of other offenses (*People v. Lindgren* (1980), 79 Ill. 2d 129), such offenses are relevant if additional reasons are present. (*People v. Armstrong* (1968), 41 Ill. 2d 390.) In the instant case, we believe the evidence of the Wicinski incident was relevant to the defendant's knowledge as to Siefert's unauthorized entry of the apartment and concomitantly tends to negate the defense that the prosecutrix consented to intercourse.

Whether to admit or exclude evidence of this type is within the discretion of the trial court. (*People v. Lieberman* (1982), 107 Ill. App. 3d 949, 955.) In the absence of a clear showing of an abuse of that discretion, no reversal is warranted.

## PRIOR CONVICTION

The defendant contends the record clearly indicates the trial judge failed to acknowledge any potential prejudice that could result from admission of his prior conviction for burglary, and appeared to ignore the balancing test required by *People v. Montgomery* (1971), 47 Ill. 2d 510. That test requires the court to weigh the probative value of the evidence of the defendant's prior conviction against its potential prejudicial effect on the jury. Defendant asserts the court's crucial knowledge and understanding of *Montgomery* is not evident in the record. Alternatively, defendant suggests the court abused its discretion in allowing admission of the prior conviction.

The State points out the defendant made the same argument to the trial court during the hearing on his motion *in limine*. The State countered the defendant's balance argument, replying that the bur-

glary offense, a felony, is appropriate for impeachment purposes and relates more directly to the issue of credibility than do many other felonies.

The defendant argued at the hearing that the only inference the jury could make from the evidence of the burglary conviction was that the defendant once had "entered into someone's home without permission and now it's a second time." The State responded the jury would likely not make the similarity connection between the offense of burglary and the offenses of rape and home invasion. The court stated it did not believe the evidence of the prior offense would unfairly prejudice the defendant, and denied the motion *in limine*.

■ The trial court need not spell out its reasons for allowing a prior conviction as impeachment evidence. (*People v. Washington* (1973), 55 Ill. 2d 521; *People v. Thibudeaux* (1981), 98 Ill. App. 3d 1105; *People v. Monigan* (1981), 97 Ill. App. 3d 885.) However, the record must indicate the court actually applied the balancing test. (*People v. Nolden* (1980), 91 Ill. App. 3d 532; *People v. Bassett* (1980), 84 Ill. App. 3d 133.) We conclude the record shows the court did exercise its discretion before denying the defendant's motion *in limine* and subsequently allowing evidence of his prior conviction at trial.

■ Further, no abuse of the court's discretion is evident, although generally the more similar the prior and present offenses are, the more danger of unfair prejudice. However, the sole fact of similarity is not a reason to exclude the evidence of the prior offense; the balancing test still applies. While burglary may be committed with regard to any type of building, the offense of home invasion is limited to dwellings, and the offense of home invasion requires no contemporaneous intent to commit either a felony or theft.

·Accordingly, we conclude no clear abuse of the court's discretion has been shown, and reversal is not warranted.

REASONABLE DOUBT

Lastly, the defendant contends he was not proved guilty beyond a reasonable doubt of rape and home invasion, and that his convictions must be reversed. He asserts this is so "in light of the prosecutrix' fear of Roxanne Burdick's jealousy; her failure and, in fact, initial refusal to seek immediate help; and her admitted failure to fight off the defendant during intercourse." He argues these factors clouded the complainant's testimony, rendering it less than clear and convincing. Despite the absence of such clear testimony, the jury nevertheless found the defendant guilty because it was distracted by—and prejudiced against the defendant—by the evidence of the defendant's prior

burglary conviction and his use of a badge earlier that morning to impersonate an officer.

The State responds no reversal is warranted because the prosecutrix' testimony was clear and convincing and, further, was corroborated by other evidence. We concur with the State.

The defendant's assertion that the prosecutrix felt compelled to go along with Roxanne's urging that she charge the defendant had raped her in order to preserve their friendship is not supported by the record. It strains logic to believe, as defendant suggests, the the prosecutrix after being raped three times by two different men would seek comfort in the company of a woman she feared. The record does show she had at one time felt afraid of Roxanne's jealousy, and requested a shift change at their common place of employment in about September 1981 in order to avoid any confrontation. However, Roxanne testified the cause of their estrangement between February and September of 1981 was because Roxanne had accused her of taking some money from her and because of her rough treatment of Roxanne's daughter. Roxanne denied the cooling-off of their friendship had even a slight connection with the defendant.

The record shows Roxanne's testimony that her relationship with the defendant lasted only from October 1980 until July 1981. Further, she did complain in August to her union steward that she was upset because she "found that slut [the prosecutrix] with John [the defendant] in the [Olde Coachman] bar." However, this incident occurred during the time she and the prosecutrix were estranged as a result of the money matter. They reconciled in September, and Roxanne said she was going out with someone else, therefore, it did not matter to her that the defendant had stopped calling her.

The prosecutrix admitted she worried about being friends with the defendant because of Roxanne's jealousy, but she did not consider him her boyfriend. The occasions she was with him at the bar or having pizza were not planned encounters; the defendant would arrive at a place where she already was, and in two or three instances he would just show up at her apartment.

She testified she last saw the defendant about two months prior to December 18. At that time she told him "he caused too much trouble between Roxanne and I, and he wasn't my friend anymore, and that I didn't want to be his friend, and I slammed the door in his face."

The theory advanced by the defendant, that the prosecutrix "went along with Roxanne's urging that she press charges against the defendant" in order to maintain this friendship, does not follow from

the above facts. Additionally, the prosecutrix testified that on December 18, 1981, Roxanne was her closest friend. Roxanne was going out with someone else, did not mind that the defendant had stopped seeing her, and the prosecutrix had not seen the defendant after she told him that she did not want to be his friend anymore and slammed the door in his face. Certainly Roxanne's urging that she call the police is the same exhortation any reasonable person would have made.

Defendant contends the prosecutrix admitted she did not fight off the defendant, thus precluding her claim of rape. He cites *People v. Rossililli* (1962), 24 Ill. 2d 341, for the proposition that voluntary submission by the female, while she has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of rape. As the State notes, however, there was no evidence in *Rossililli* of resistance by the victim. She testified only that the defendant said that he would hurt her if she did not comply, and that he held her down. Additionally, we note the court there stated it found her testimony was not clear and convincing, and her testimony as to force and lack of consent was entirely uncorroborated. The court there also found the evidence did not support an inference that the victim was so paralyzed by fear or overcome by physical force that she was powerless to resist. 24 Ill. 2d 341, 347.

Here, although it is true the prosecutrix testified she did not hit, scratch, or bite the defendant, she did testify she tried to run out the door after the defendant came into the dark apartment, and that she swung her arms and legs at the two intruders in order to break free. Further, after once being subdued by Tom Siefert blocking off her breathing by simultaneously covering her nose and mouth with his hand, she broke free and bolted for the door again. She grabbed the defendant, who was kneeling in her path, between his legs and twisted. The defendant then got her in a choke hold, threatened to break her neck, and made her walk into the bedroom where he lay on the bed with her, maintaining his hold on her, until Tom Siefert mounted her and told the defendant he could handle her. She also testified she pushed the defendant away from her as hard as she could, and that while he was having intercourse with her, he threatened her with anal intercourse by Tom Siefert if she did not do as he told her. There was further testimony that Tom Siefert had pulled her hair, and had bitten her cheek.

There was also physical evidence which corroborated the prosecutrix' version that the intercourse was nonconsensual. The physician who examined her shortly after the rape, testified she had inflamma-

tion of her left scalp area, swelling on her cheek, scratches on her nose, redness in her neck area, and abrasions and redness on her genitalia. The doctor indicated those physical manifestations are not usual incidents of sexual intercourse. Roxanne Burdick and police officer Kuffel's testimony about the prosecutrix' physical condition were essentially the same as the doctor's.

Defendant claims the prosecutrix' failure to seek "the most immediate or effective help" after the incident is the third and final factor which casts reasonable doubt on his guilt. He points out she did not seek help from her neighbors in the adjacent apartment, the Divokys, nor from the police at the station located merely one block from her apartment. Rather, she walked five or six blocks to Roxanne's house, and rejected the suggestion that the police be called. Defendant claims the prosecutrix' reluctance and delay in making a prompt complaint weakens her testimony, and raises serious doubt, citing *People v. Szybeko* (1962), 24 Ill. 2d 335, 340, and *People v. Bain* (1972), 5 Ill. App. 3d 632, 635.

As the State points out, the victim in *Szybeko* did not complain until six hours after the incident, and failed to present either the blood-splattered dress she claimed she was wearing, or produce the doorman from her dormitory who she testified had seen her condition and the dress immediately after the incident. Additionally, the defendant's testimony was wholly corroborated by another witness. In *Bain*, the court considered that even the evidence which tended to corroborate the victim's testimony was weakened by her failure to make a timely complaint at either her first or second opportunity; to-wit, to her friend's mother, or to her roommate. However, the court had initially concluded that the victim had made no serious physical effort to resist. Such is not the case here.

In addition to the prosecutrix' resistance, the record here shows there were valid reasons why she did not first complain to her neighbors or to the police. She testified that even though she screamed during the attack, none of her neighbors responded to the screams. Secondly, although she admitted she did not believe Tom Siefert was a policeman after the rape occurred, nevertheless, he had shortly before used a badge and the authority it represents to gain access to her apartment. Under these circumstances, it does not seem illogical to us that she would bypass these two first opportunities and report her complaint instead to the woman whom she regarded as her closest friend.

We consider ludicrous the defendant's suggestion that the prosecutrix wanted to "be first" to give her version of the story to Rox-

anne before the defendant could get to tell Roxanne of his and the prosecutrix' intimacy. The defendant clearly testified he did not like Roxanne, but he did like the prosecutrix. We can perceive of no reason why he would wish to tell Roxanne anything at all about his personal relationship with the prosecutrix. We point out also that the first thing the prosecutrix tried to do after the rape was to call someone on the phone. She was unable to do so, however, because the defendant or Siefert had unplugged and hidden the phone cord. The second thing she did was look for her keys, but she could not find them. We conclude her complaint was prompt, and no reasonable doubt as to the defendant's guilt was raised thereby.

The reviewing court will not set aside a verdict of rape unless the evidence is so palpably contrary to the finding or so unreasonably improbable and unsatisfactory that there is reasonable doubt as to the guilt of the accused. (*People v. Witte* (1983), 115 Ill. App. 3d 20, 24; *People v. Reese* (1973), 54 Ill. 2d 51, 57-58.) The evidence here sustains the defendant's conviction for rape, and no reversal is warranted.

■■ As we initially noted, the defendant was sentenced to 12 years' imprisonment for rape, and to the same term of imprisonment for the home-invasion conviction, which we now vacate. Considering that the trial judge sentenced the defendant separately for each offense, and the record does not indicate that the trial court was influenced by the home-invasion conviction in imposing the sentence for rape, a remand for resentencing is unnecessary. *People v. Payne* (1983), 98 Ill. 2d 45, 57.

The defendant's conviction and sentence for home invasion is vacated due to the failure of the indictment to state an offense; the judgment and sentence of the circuit court of Lake County as to the rape offense is affirmed.

Affirmed in part; vacated in part.

SEIDENFELD, P.J., and NASH, J., concur.