THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY D. BELL, Defendant-Appellant.

First District (5th Division) No. 1—88—0166

Opinion filed June 28, 1991.—Rehearing denied September 11, 1991.

Randolph N. Stone, Public Defender, of Chicago (Mark H. Kusatzky, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David R. Butzen, and T. Michael Leuer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Larry D. Bell, was charged by indictment with six counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(a)(2), (b)(1)), and one count each of unlawful restraint (Ill. Rev. Stat. 1983, ch. 38, par. 10—3(a), aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 10—2(a)(2)), kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 10—1(a)(2)), aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a)) and aggravated battery to a child (Ill. Rev. Stat. 1983, ch. 38, par. 12—4.3(a)). Defendant filed two pretrial motions, one to suppress statements and the other to bar the use of his prior convictions for impeachment purposes. Both motions were denied. Defendant waived trial by jury, and at the end of the State's case in chief, defendant was granted a directed verdict on two of the six aggravated criminal sexual assault charges. At the close of the trial, defendant was found guilty of five counts of aggravated criminal sexual assault, and also guilty of the charges of unlawful restraint, aggravated kidnapping, kidnapping and aggravated battery. He was sentenced to concurrent 60-year terms on the five aggravated criminal sexual assault counts, and 30 years on the aggravated kidnapping charge, to run consecutive to the 60-year terms. He was also sentenced for five years on the aggravated battery charge and three years for unlawful restraint, both to run concurrently with the other terms. No sentence was imposed on the kidnapping charge as it merged with the aggravated kidnapping. Although the court stated that the State had proved every charge aside from the one dismissed,

no verdict was entered or sentence imposed on the charge of aggravated battery to a child.

Defendant now appeals, alleging that the trial court erred in denying his pretrial motions to suppress statements and to bar the use of his prior convictions for impeachment. He also alleges that the trial court made several erroneous evidentiary rulings during the trial, that he was not proven guilty beyond a reasonable doubt and finally that his sentence was excessive. For the reasons stated below, we affirm as to the pretrial motions and rulings at trial, and as to the sentencing, affirm in part, vacate in part and remand in part.

FACTS

I. MOTION TO SUPPRESS

On June 16, 1987, a hearing was held on defendant's motion to suppress statements he made at the Forest Park police station on May 29, 1986. Although the substance of those statements was not revealed at the hearing, testimony at trial later revealed that the defendant had made several incriminating admissions that day. Three witnesses testified. The first was Assistant State's Attorney Carol Kelly. She testified that on the evening of May 29, 1986, she met with the defendant at the Forest Park police station. Also present was Inspector (now Sergeant) William Pates of the Forest Park police department. Kelly read the defendant his *Miranda* rights, which defendant said he understood. She also gave him a printed copy of the *Miranda* rights, which he read and signed. At that point, Kelly asked the defendant if he wished to talk with them. Defendant said he did not want to talk but wanted to know what the charges were. Kelly informed him that the charges were two counts of aggravated criminal sexual assault. Pates then told the defendant about the allegations against him, which Kelly estimated took one or two minutes. Kelly testified that the defendant then said that he wanted to tell his side of the story. She then asked the defendant if he did in fact want to talk, to which he answered that he did. Kelly asked the defendant if he had been well treated and fed, which he said he had. He requested a cigarette, which Pates went out of the room to get. While Pates was absent, Kelly again informed the defendant that he did not have to talk with them, that he could stop talking at any time and demand a lawyer. Upon Pates' return, the defendant, Kelly and Pates had a conversation about the events of the previous evening.

On cross-examination, Kelly said that she and Pates did not leave the room when the defendant initially said he did not want to talk

with them. She also said that defendant's statement that he did not want to talk and his question as to the charges were said in one sentence.

The second witness at the suppression hearing was Sergeant William Pates of the Forest Park police department. He also testified that Kelly had read the defendant his *Miranda* rights and given him a printed form of the rights to sign. Pates said that in response to the defendant's question as to what he was being charged with, he told him that a 10-year-old girl had made some allegations that he kept her against her will in an apartment overnight and had sex with her on two occasions. He also said that after telling this to the defendant, the defendant said he wanted to tell his side of the story. Pates again asked him if he wanted to talk with them, to which he responded that he did. At that point, Kelly left for a previous appointment, and Pates and defendant were left alone for about one-half hour.

On cross-examination, Pates said that when he told the defendant about the allegations made by the girl, he was simply explaining in another fashion what Kelly had previously told to the defendant. After the defendant told his version of the events of the previous evening, Pates told him that the story was not true, and that Pates had a statement from defendant's brother which contradicted the defendant's story. According to Pates, the defendant then changed his story.

The final witness at the hearing was Officer Steve Knack of the Forest Park police department. He testified that Pates had called him to the office where Pates and the defendant were, and that the defendant orally repeated his story and then wrote out his statement while Knack was present. He also testified that no threats or promises were made to the defendant.

The defendant called no witnesses at the hearing. The court found that the statements were voluntary and denied the motion to suppress.

## II. TRIAL

The trial began on November 5, 1987. The first witness for the State was the victim, M.M., who was 12 years old at the time of trial. The court declared her qualified to testify after both the prosecutor and defense counsel questioned her as to her ability to recollect and to tell a lie from the truth.

She testified that on May 28, 1986, she went home after school to play with her cousin. They had an argument, and M.M. was sent to her room by her aunt. M.M. got mad, wrote a note, and left the house to go to her father's house in Maywood. M.M. lived in Chicago, with

her mother, her grandmother and her aunt. She walked from Chicago into Oak Park, and then into Forest Park, where a man approached her from behind and took her by the hand. In court she identified the defendant as the man who grabbed her hand. Although she could not remember the street where she encountered the defendant, she did remember that there were many restaurants and stores, and a liquor store where the defendant stopped.

The defense requested a sidebar at this point, objecting to the manner in which the prosecutor was leading the witness. The court stated that it would allow limited leeway due to the age of the witness.

Continuing her testimony, M.M. stated that the defendant took her to his house. She said she tried to get away, but the defendant held her hand tightly. Inside the house, the defendant took her to the bedroom, and he took off his clothes. When she refused to take her clothes off, he took them off. He then told her to kneel down, which she did. He stood in front of her and told her to lick his penis. She did as he told her. He then made her lie down on the floor on her back and started kissing her. Next he put his penis in her vagina. M.M. testified that he kept it there for about 15 minutes, after which they both got dressed and went into the living room.

M.M. told the defendant she wanted to go home, but he said she had to wait. He then told her to lick his penis again, which she did. After that, he told her to go to the bedroom and take off her clothes. She refused, and he removed her pants and underwear and told her to lie down on her stomach. He then stuck his penis in her "behind," where he left it for about five minutes, after which he gave her some grease to put in her "behind."

Both M.M. and defendant dressed again and went to the living room. When she again told him she wanted to go home, he said that it was too late and she had to wait until the next bus came. Defendant fell asleep on the couch, and M.M. watched television. She did not try to leave the apartment while defendant was asleep. In the morning defendant walked her to the bus stop. She took the bus and went home.

Upon arriving home, M.M. met her aunt in the hallway. The aunt asked her if anything had happened to her, "did [she] get raped or something?" The defense objected to this question on the grounds of no foundation, and the court overruled. M.M. told her "yes." M.M. then went upstairs where she met her mother, who called the police. After the police arrived, M.M. was taken to the hospital where she was examined for about 30 minutes. When the police arrived at the

hospital, she told them she thought she could take them to the place where the incident occurred, and she then led the police officers back to the defendant's house. Later, at the police station, she viewed a lineup and identified the defendant.

At this point of her testimony, the prosecutor showed M.M. a photograph which she initially said she did not recognize. Nor did she recognize the men in the photograph. Over the objection of the defense, the court told her to pick up the picture and look at it. The witness said she could not remember any of the men. Finally, when over several objections by the defense the prosecutor asked her if she recognized anyone in the photograph, she said yes, she did, the defendant.

The witness then identified several photographs of the defendant's house, its back door, bedroom and living room. She also identified a photograph of teeth, which she said she saw the defendant take out of his mouth in the bedroom.

On cross-examination, M.M. was unable to name the exact streets she walked on, but she did know there were many restaurants and a White Hen Pantry. Nor did she know what time it was when she met the defendant, only that it was dark. She did remember that when she was walking with the defendant they made several turns, and she was able to remember when they turned left or right. While walking along the street, she saw some men working on the street, but did not yell out because the defendant told her to be quiet. Nor did she yell or wave to anyone driving by. She did try to get away once.

She also testified that she did not remember talking to any female police officers when she was at the hospital, nor did she remember riding in a police car with a woman officer. She did remember talking with a male officer at the police station. She then admitted that she told the officer that the defendant did not succeed in putting his penis in her vagina, and that she said she would scream if he did.

When the defense asked M.M. to describe the man who attacked her, she answered that he was "short and had curls." When counsel asked "[Y]ou don't remember anything about his face?" the State's objection to the question was sustained. Questions as to his hair, clothing and eye color were allowed. Another objection to a general question about his face was sustained over the defense argument that the question went to credibility and the ability to recall, with the court stating that M.M. had already identified the man twice. At a sidebar, the court said it would allow specific questions, *i.e.*, "did he have a beard?" but not general questions. The court stated that the defendant's sixth amendment rights were not denied since M.M. had already identified the defendant in court.

At the sidebar, the court also refused defense's request to question the witness about other possible sexual assaults upon her in the three days before defendant's alleged assault. Defense counsel represented that a defense witness from the State crime lab would testify that the only place semen was found was in the victim's vagina, and that police officers would testify that M.M. told them that the defendant did not penetrate her vaginally. Therefore, he reasoned, since defendant denied assaulting the victim, it was necessary for him to explain away the presence of semen in her vagina by establishing that M.M. had been assaulted by someone other than the defendant. The court rejected the defendant's reasoning and denied the request.

When questioning of the witness resumed, M.M. testified that when the defendant walked her to the bus stop in the morning, she did not say anything to a person they stopped to talk to on the street. Nor did she say anything to the bus driver or any of the passengers.

The second witness for the State was Officer Kay Kibort of the Oak Park police department. She met with the victim, M.M., at St. Ann's Hospital on the morning of May 29, 1986. M.M. told Kibort that she could lead the officer to the location where the incident had occurred. Officer Kibort then related how the victim directed her to the house, later identified as the defendant's brother's apartment. Throughout the testimony, numerous hearsay objections were made by the defense when the witness would say "[M.M.] told me to turn ***." The objections were overruled on the basis that the testimony was being offered only to show why the officer followed the actions she did.

Sergeant William Pates was the next witness. He related his meeting with the defendant in defendant's brother's apartment around noon on May 29. Pates told the defendant that there had been some allegations that something occurred in the apartment the previous night, and asked if defendant would come to the police station to talk about it. The defendant said he would be more than willing to.

Pates then testified as to his meeting with the defendant and Assistant State's Attorney Kelly that evening at the Forest Park police station. As he had testified at the suppression hearing, Pates said that defendant had been read his *Miranda* rights and signed a printed waiver of those rights. (It was at this juncture that the crucial colloquy between the defendant and Pates and Kelly which was the subject of the suppression hearing, discussed above, occurred.) Pates then related the story told to him by the defendant. Initially the defendant said he had been with his brother in Maywood the previous night. When Pates told him that he (Pates) had already talked with

the brother and defendant's story could not be true, defendant then changed his story. He then admitted meeting the victim the night before and offering to try to help her find her father's house. They were unsuccessful in finding her father's house. M.M. asked to go home, but defendant told her it was too late and he would take her to the bus in the morning. He then took her to his brother's apartment, where they ate and watched television.

Pates said that when he asked the defendant if he had any sexual relations with the girl, he replied he had thought about it but was "real proud that he hadn't." He also said the defendant answered no when Pates asked him if he touched her in any way she might have misunderstood or misconstrued as having sexual relations with her.

Pates further testified that after defendant finished his story, Pates told him that the victim was at the hospital having reconstructive surgery because her rectum was ripped open the previous night, to which defendant responded "I didn't know I hurt her." Defendant said he thought he was helping the little girl. Pates replied that if he thought having sex with a 10-year-old girl was helping her, defendant needed help. Defendant responded that yes, he might need some help.

Investigator Knack then joined Pates and the defendant, and defendant orally repeated his statement, which was then transcribed and signed by the defendant. When Pates asked defendant if the written statement was the whole truth, defendant answered "yes, except for the sex part."

After Pates' testimony, the State asked that the photographs shown to M.M. be admitted in evidence. The defense objected to admission of the lineup photograph on the basis that no foundation had been laid. The objection was overruled. The parties then stipulated to medical evidence as to the victim's injuries and to the reconstructive surgery performed on her.

The State rested, and the defense moved for a directed verdict. The motion was granted on two of the counts of aggravated criminal sexual assault which involved sexual intercourse introducing a penis into the vagina, and denied on the other charges.

The first defense witness was Cynthia Jane Barrera of the Illinois State Police Crime Laboratory, an expert in forensic serology. She testified that semen was found on a vaginal swab taken from the victim, but no semen was found in the oral or rectal swabs. Her tests were unable to either include or exclude any male as a possible source of the semen.

Defendant then testified. He admitted meeting M.M. on the night of May 28, 1986. He said he tried to help her find her father's house,

but she was unable to give him an address or a description of the house. He suggested to her that they go to the police, but M.M. refused. They then went to his brother's apartment, where he fed her some dinner while they talked and watched television until she fell asleep. The next morning he walked her to the bus stop.

On cross-examination, defendant said that he did not call the police when he first met M.M. because she said that if he called, she would run away. He also denied ever telling Pates or Kelly any story other than the one he told in court. He further said that when he said to Pates that he might need help, he was asking for help in understanding why it was wrong to try to help a little girl.

In rebuttal, the State called Assistant State's Attorney Carol Kelly. She testified that the defendant had indeed told her and Pates that he was not at the apartment in Forest Park when the incident allegedly occurred, but changed his story when Pates told him the story was not true.

The State then offered into evidence certified copies of prior convictions of the defendant which were admitted over defense objection. The admissibility of these convictions had been previously considered at a hearing on defendant's motion *in limine*. At that hearing, the trial court excluded two convictions for which the defendant had been released more than 10 years before his arrest in this case. It allowed the admission of a conviction for indecent liberties with a child for which he was released in 1977, and a conviction for burglary in 1980. Defendant argued at the hearing on his motion that the indecent liberties conviction was too similar to the current charges against him and therefore more prejudicial than probative. He also argued that the burglary conviction had no rational relationship to the charges.

After closing arguments, the court found defendant guilty on nine counts: five counts of aggravated criminal sexual assault, unlawful restraint, aggravated kidnapping, kidnapping and aggravated battery. In finding him guilty, the court referred to one charge as being dismissed, although at the close of the State's case it had granted the defendant a directed verdict on two counts. No reference was made to the charge of aggravated battery to a child. Defendant filed a post-trial motion, alleging numerous errors.

OPINION

I. THE MOTION TO SUPPRESS

On appeal, defendant first alleges that the trial court erred in denying his motion to suppress. He contends that his fifth amendment

right to remain silent was violated when the interrogation continued after he said he did not wish to talk to Pates and Kelly. We disagree.

■ Under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and its progeny, *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, and *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, the United States Supreme Court has established the tests a court is to apply in determining whether an individual's fifth amendment rights have been violated. *Miranda* dictates that an individual subject to a custodial interrogation must be informed of his right to remain silent and his right to counsel prior to questioning. That case also determined the procedures to be followed when an individual in custody invokes either of those rights. If he requests counsel, the interrogation must cease until a lawyer is present; if he indicates he wants to remain silent, the interrogation must cease. *Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.

The United States Supreme Court, having provided that interrogation must cease if an individual invokes his *Miranda* rights, has also addressed the conditions under which an interrogation may be resumed. In *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85, the Court held that "an accused *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Although in *Edwards* the defendant invoked his right to counsel and in the instant case the defendant simply invoked his right to remain silent, the rule in *Edwards* is nonetheless applicable. We must therefore look to whether the defendant himself initiated the communication with the authorities after he invoked his right to silence.

■ To "initiate" further communications in this context, the individual must evince a willingness to discuss the substance of the investigation. (*Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045-46, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2835.) This is to be contrasted with inquiries into the routine aspects of custody, such as asking for a drink of water or to make a telephone call. (462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) In *Bradshaw*, the defendant asked "well, what is going to happen to me now?" (462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) The Supreme Court found that, although somewhat ambiguous, this question indicated a

desire for a generalized discussion about the investigation. Here, the defendant asked "[W]hat are the charges against me?" The defendant's question clearly related to the investigation and therefore should suffice to constitute "initiation" of communications by the defendant.

■ Our inquiry does not end here, however. The State must also show that subsequent events indicate a waiver of the defendant's previously invoked fifth amendment rights. (*Bradshaw*, 462 U.S. at 1044, 77 L. Ed. 2d at 412, 103 S. Ct. at 2834.) To make this determination, we look to the totality of the circumstances, including the fact that the defendant was the one who initiated the conversation, a fact which is necessary but not sufficient. (*Edwards*, 451 U.S. at 486 n.9, 68 L. Ed. 2d at 387 n.9, 101 S. Ct. at 1885 n.9; see also *Bradshaw*, 462 U.S. at 1044-45, 77 L. Ed. 2d at 412, 103 S. Ct. at 2834.) The waiver, to be valid, must be both knowing and intelligent. Here, according to the undisputed testimony at the hearing, the authorities made no threats or promises to the defendant, nor was there any coercion. Moreover, the defendant was advised of his rights several times: initially when Kelly read them to him, then when he read and signed the written form, and twice again after he indicated that he wanted to tell his story. (*Cf. People v. Dennison* (1973), 13 Ill. App. 3d 423, 300 N.E.2d 300 (where the State's Attorney persisted in questioning after the defendant repeated that he did not want to talk, and defendant never said he wanted to tell his story).) Therefore the evidence amply supports the conclusion that defendant here knowingly and intelligently waived his right to remain silent after he initially indicated that he chose to invoke that right.

■ Defendant here contends that his rights were violated because the interrogation did not cease immediately upon his initial statement that he did not want to talk. He urges that some unspecified but "sufficient amount of time" must pass before any later statements will be admissible. In *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, where the interrogation was reinitiated by the State after the defendant expressed a desire not to talk, the lapse of time between the defendant's refusal to talk and the reinitiation of communications was a significant factor. However, the cases of *Bradshaw* and *Edwards* teach us that where the defendant initiates further communications, the passage of time after the invocation of *Miranda* rights is not a critical element. What is important is the fact that further communications were initiated by the defendant. This distinction was recognized in *Mosley*, where the Court characterized as "absurd" a reading of *Miranda* which would exclude from evidence statements made after the cessation of an interrogation even if those

statements "were volunteered by the person in custody without any further interrogation whatever." *Mosley*, 423 U.S. at 102, 46 L. Ed. 2d at 320, 96 S. Ct. 325-26.

Each of the cases cited by defendant in this regard is distinguishable on the same basis. In each, after the defendant said he did not want to talk, the authorities continued the questioning. (See *People v. R.C.* (1985), 108 Ill. 2d 349, 483 N.E.2d 1241; *People v. Brown* (1988), 171 Ill. App. 3d 993, 525 N.E.2d 1119; *People v. Dennison* (1973), 13 Ill. App. 3d 423, 300 N.E.2d 300.) Here, the evidence at the hearing on the motion to suppress supports the conclusion that the interrogation did cease. Kelly and Pates did not continue to question the defendant. Instead, it was the defendant who continued the conversation. It was not until after the defendant indicated his willingness to talk with the authorities and waive his right to silence that any comments were made by Pates or Kelly which might be considered interrogation.

The trial court's ruling on the motion indicates that it found the defendant's statements to be voluntary, and, therefore, it denied defendant's motion to suppress. As we do not find that ruling to be contrary to the law and the manifest weight of the evidence, we affirm.

## II. TRIAL

The defendant also raises several issues as to rulings made during trial. He contends: (1) When the victim could not identify the defendant in the lineup photograph, it was error for the court to allow the question to be asked again, and that it was improper for the trial court to intervene by telling the victim to re-examine the photograph; (2) defense counsel was improperly restricted in his cross-examination of the victim by not being allowed to ask general questions; (3) Officer Kibort's testimony as to the street directions the victim gave her was hearsay and should not have been admitted; (4) the victim should not have been allowed to testify as to her answer to her aunt's question whether she had been raped; (5) defendant was denied his sixth amendment right to cross-examination when he was not allowed to question the victim as to prior sexual contact; (6) it was error to admit evidence of his prior convictions for purposes of impeachment; and (7) the defendant was not proven guilty beyond a reasonable doubt since the victim lacked credibility and the medical evidence did not corroborate the charges.

As to the admission into evidence of the lineup photograph, we find no merit to the defendant's contention that the judge errone-

ously intervened in questioning the witness, and that absent that intervention, there would be no foundation to admit the photograph. A trial judge has the duty to clarify a question or answer which appears confusing. (*People v. Hodges* (1974), 20 Ill. App. 3d 1016, 1020, 314 N.E.2d 8, 12.) He may ask questions himself of the witness when necessary for that purpose. "The propriety of such examination must be determined by the circumstances of each case, and rests largely in the discretion of the trial court. [Citation.] This is especially true where the cause is tried without a jury, and the danger of prejudice is lessened." (*People v. Palmer* (1963), 27 Ill. 2d 311, 315, 189 N.E.2d 265, 268.) Here we have a bench trial and a witness of relatively tender years. Under the circumstances of this case, we do not find that the trial court abused its discretion in redirecting the focus of the witness to the photograph. Nor do we find that by allowing the prosecutor to re-ask his question after the young witness looked at the photograph to be improper. She testified that she did not recognize the *men* in the photograph, but when asked if she recognized any one of them, she identified the defendant. Considering the age of the witness, the context of the testimony and the fact that it was a bench trial, where the judge can be relied upon to better perceive any infirmity in the witness's testimony, this testimony can be allowed to stand.

Moreover, the complaining witness had already identified the defendant twice—in a lineup at the police station the day after the incident, and in open court at the trial. The additional identification in the photograph even if erroneously admitted in no way prejudiced the defendant.

■ We also find defendant's claim that his right of confrontation was violated by the restrictions placed on his cross-examination of the victim to be without merit. The defendant here contends that he should have been allowed to cross-examine with questions such as "do you remember anything about his face?" which seek to elicit a general narrative answer in order to test the witness' identification of the defendant.

The scope and manner of cross-examination are within the discretion of the trial court. However, that discretion to limit a criminal defendant's cross-examination does not arise until the defendant has been afforded sufficient cross-examination to satisfy the confrontation clause. (*People v. Rufus* (1982), 104 Ill. App. 3d 467, 473, 432 N.E.2d 1089, 1095.) We must, therefore, look to what the defense counsel was allowed to ask, before focusing on what he was prevented from asking, in order to determine whether sufficient cross-examination was allowed. No violation of the defendant's right to confrontation will be

found if it appears from the record that the trier of fact has been made aware of relevant areas of impeachment. (104 Ill. App. 3d at 473, 432 N.E.2d at 1095.) The record before us clearly reveals that the defense was allowed to question this victim as to her identification of the defendant. He was allowed to ask specific questions, *i.e.*, hair, clothes, eye color, beard and mustache. Some she was able to remember, others she was not. The trial court stated further general questions would have little impact in light of her previous identifications made at the lineup and in court.

On review, we will not reverse a trial judge's decision limiting cross-examination, absent a clear abuse of discretion resulting in manifest prejudice. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 533, 453 N.E.2d 849, 859.) We do not find an abuse of discretion here. Moreover, we find no prejudice to the defendant resulting from the judge's actions. As discussed above in relation to the lineup photograph, the victim had already identified the defendant twice. Also, the defendant admitted that he was with the victim on the night in question. Therefore, even if there was error, it was clearly harmless.

■ Defendant's third claim of error at trial concerns the testimony of Officer Kay Kibort. He contends that her testimony as to the street directions the victim gave her was inadmissible hearsay. It is the State's contention that the victim's statements were offered not to prove the truth of the matter asserted and therefore were not hearsay, but rather were offered to show why the officer took the steps she did in her investigation. We agree with the State that this limited purpose was not hearsay.

Initially, we note that defendant has waived this issue due to his failure to specifically object to this testimony in his post-trial motion. His motion states merely "[t]he Court erred in admitting hearsay evidence throughout the trial." To preserve an error for review, a party must make an objection at trial and include the issue in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) In his post-trial motion, the defendant must be specific. He cannot simply allege that hearsay testimony was erroneously admitted. (See *People v. Smith* (1985), 139 Ill. App. 3d 21, 27, 486 N.E.2d 1347, 1350-51 (defendant claiming inflammatory remarks by prosecutor must recite specific remarks).) Therefore, defendant's failure to specifically object to Kibort's testimony waives this issue on review.

However, even absent a waiver, we do not find that the trial court erred in admitting Kibort's testimony regarding M.M.'s statements. Kibort testified without objection that she met the victim at the hospi-

tal, and that the victim said she could lead Kibort to the house where the incident occurred. She then recounted how M.M. directed her to defendant's brother's house. Defense counsel objected to those portions of Kibort's testimony where she related the specific directions she received from the victim, by testifying, *e.g.*, "[M.M.] said make a left turn." Defendant contends that such testimony is hearsay and therefore inadmissible. We disagree.

We agree that insofar as M.M.'s statements were not offered to prove the truth of their content, they are not hearsay. Moreover, we question whether operational statements directing action, such as "make a left turn," are even capable of being offered for the truth of their content, since they have no content apart from their directive function. Nor was there error in permitting the State to show why Kibort took the steps she did in arriving at the house where the assault had occurred. "[I]n a criminal prosecution, it is permissible for a police officer to testify as to prior out-of-court statements about the circumstances of an investigation to detail the steps leading up to a defendant's arrest ***." (*People v. McNeal* (1987), 160 Ill. App. 3d 796, 800, 513 N.E.2d 897, 900.) We therefore find no error in the admission of this testimony.

Moreover, we do not believe that admission of these statements, even if erroneous, resulted in prejudice to the defendant. Since the defendant admitted that the house to which complainant directed the police was in fact the house where he and M.M. had been the previous night, any error in admitting Kibort's testimony was harmless.

■ As to M.M.'s testimony regarding her affirmative answer to her aunt's question as to whether she was raped, we likewise find no error. We initially note that defendant has waived this issue by his failure to object at trial to this testimony on the grounds he now raises on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) He did offer an objection, but it was based on foundation, which is not what he argues before this court. (See *People v. Cox* (1990), 197 Ill. App. 3d 1028, 557 N.E.2d 288 (in which the court found the issue on appeal to be waived where defendant objected at trial but grounds for that objection did not sufficiently specify issue raised on appeal).) We also observe that, subsequently, when the prosecution attempted to elicit testimony regarding the victim's conversation with her mother, which occurred immediately after the conversation with the aunt, defense counsel then objected, and said "I don't believe this is outcry anymore. *** He's also going into someone else and after the first witness, there is no longer any outcry." In effect, he conceded that the statements to the first person, the aunt, were

not inadmissible hearsay. Although the defendant's objection was overruled, the prosecution did not pursue his questioning about any statements M.M. may have made to her mother.

In spite of the waiver here, we shall nevertheless address defendant's contention. He argues that this testimony should not have been allowed because the aunt did not testify. He bases this argument on section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10), as interpreted in the case of *People v. Sephus* (1986), 150 Ill. App. 3d 272, 501 N.E.2d 175. We reject his argument.

The statute in effect at the time of this trial provided:

> "In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:
>
> (1) testimony by such child that he or she complained of such act to another; and
>
> (2) testimony by the person to whom the child complained that such complaint was made in order to corroborate the child's testimony." (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.)

In *Sephus*, testimony by the victim's mother about the victim's complaint to her was held inadmissible because the victim did not unequivocally testify about her complaint to her mother. The court held that with respect to the testimony of the person to whom the child has complained, there is a two-pronged test: "first, there must be testimony of the complainant to the witness and, second, the testimony of the witness to whom the complaint was made must be corroborative in nature." (*Sephus*, 150 Ill. App. 3d at 275, 501 N.E.2d at 177.) Failure to satisfy either prong would result in testimony by the person to whom the child complained as to the complaint being inadmissible hearsay.

The issue in this case, however, is not the testimony of the person to whom the complaint was made, but rather the testimony of the victim herself. As to that, subsection (1) of the statute, which deals with testimony by the victim, does not require testimony by the person to whom the complaint was made. This is in contrast to subsection (2), which refers to testimony by the person to whom the complaint was made as "corroborat[ing] the child's testimony," thus requiring that the child first testify as a prerequisite to the admissibility of the testimony by the person to whom the complaint was made. (It should be noted that a subsequent modification to the statute no longer requires

testimony by the child if the child is not available in order to permit the testimony of the person to whom the complaint was made. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10).) The language of the statute provides no support for the argument that the child cannot testify as to a complaint if the person to whom the complaint was made does not offer corroborating testimony. The "and" at the end of subsection (1) in no way implies that the testimony of the person to whom the complaint was made is a prerequisite to the admissibility of the child's testimony.

This approach is consistent with the trend in Illinois to increasingly overlook the hearsay nature of substantive testimony offered by a witness in court and subject to cross-examination, about prior statements which the witness made out of court. (See *People v. Romo* (1980), 85 Ill. App. 3d 886, 407 N.E.2d 661 (where the court notes in holding such prior statements to be admissible that the fundamental reason behind the exclusion of hearsay, the lack of opportunity to test the credibility of the declarant through cross-examination, is absent). Accord *People v. Boastick* (1986), 140 Ill. App. 3d 78, 488 N.E.2d 326; see also *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) Under this approach the testimony of M.M. concerning her out-of-court complaint to her aunt would be admissible under the common law as long as she was subject to a full latitude of in-court cross-examination concerning those statements, which in fact she was. Accordingly, it would be unreasonable to presume, in the absence of express language to the contrary, that a statute, which is designed to facilitate proof of sexual abuse of children, would nevertheless abrogate or curtail a means of proof which is otherwise available under the common law.

■ Defendant next contends that the trial court's refusal to allow him to question the victim regarding sexual contact during the three days preceding the incident deprived him of his sixth amendment right to confrontation. He argues that such questioning was necessary to establish that some person other than the defendant had assaulted the victim. He also contends that the rape shield statute (Ill. Rev. Stat. 1985, ch. 38, par. 115—7) is inapplicable since he was not seeking to humiliate the victim or to introduce irrelevant issues, but rather was seeking to identify the person who attacked M.M. We disagree with the defendant's argument here and find that this line of questioning was properly denied by the trial court.

The rape shield statute provides in relevant part:

"In prosecutions for aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse or crimi-

nal sexual abuse, the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1985, ch. 38, par. 115—7(a).)

The language of the statute is clear and explicit. The only evidence of past sexual activity of the alleged victim which is sanctioned under the language of the statute is evidence of such conduct with the accused. *(People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726.) Here, the defendant sought to introduce evidence of sexual activity with some unidentified other person which the plain language of the statute purports to prohibit.

Defendant nevertheless contends that the constitutional guarantee of the right of confrontation should supersede the blanket exclusion postulated by the statute, citing the United States Supreme Court decision in *Olden v. Kentucky* (1988), 488 U.S. 227, 102 L. Ed. 2d 513, 109 S. Ct. 480. In that case, the Supreme Court held that Kentucky's rape shield law, which is similar to the Illinois statute, could not prevent admission of evidence which established the alleged victim's motive to lie. There, the defense sought to introduce evidence of the alleged victim's relationship with another man. The defense theory in that case was consent and that the alleged victim had fabricated the rape story so as not to jeopardize her relationship with the other man, her paramour. The alleged victim was white; her paramour and the defendant were both black. The State court had excluded the impeachment evidence on the grounds that evidence of the victim's interracial relationship created a possibility of jury prejudice against the victim which outweighed the defendant's right to confront. The Court held that the limitation on inquiry into the witness' motive to lie based on speculation as to jurors' racial bias was unreasonable.

Two years after *Olden,* our supreme court considered the interplay between a State's interest as expressed in its rape shield statute and a defendant's right to cross-examine a witness regarding the witness' prior sexual conduct. In *People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726, the defendant was the complainant's former boyfriend. The defense theory was that the complainant consented to have anal sex with the defendant and brought the rape charges only out of anger after the defendant rejected her. To support this theory the defense sought to introduce evidence that the complainant had consented to have anal sex with third persons after she testified that she did not consent to have anal sex with the defendant, and in fact had begged him to stop, because she did not enjoy it and because it was painful. The Illinois Supreme Court began its analysis with *Davis*

*v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105. The court found that "[w]ith the *Davis* decision, the Court does not present the defense with a blanket invitation to attack a witness. Rather, *Davis* limits such an attack to situations where the confrontation is both relevant and based on a showing of bias, prejudice or motive." (*Sandoval*, 135 Ill. 2d at 174-75, 552 N.E.2d at 733.) It found *Olden* to be merely an example of one of the types of cross-examination allowed under *Davis*, to show the witness' motive to lie. (*Sandoval*, 135 Ill. 2d at 186-87, 552 N.E.2d at 738.) Here, the defendant sought not to impugn the credibility of the witness by establishing bias, prejudice or a motive to lie, but rather to establish that someone other than himself had attacked her.

The Illinois Supreme Court in *Sandoval* also addresses the defendant's argument that the evidence here should be admissible because it is relevant and its admission would not humiliate the victim. The appellate court in *Sandoval* had based its decision on similar reasoning. "Where the evidence is relevant and is introduced, not to harass the witness but only in a defensive response to the alleged victim's own initiative, the statute does not preclude an exception to the general protective umbrella it places over victims of sexual assault." (*People v. Sandoval* (1989), 178 Ill. App. 3d 669, 676, 533 N.E.2d 980, 984-85.) In reversing the appellate court decision, the supreme court stated "[w]e do not find the appellate court's construction of the statute persuasive. The language of the statute *** is concise and precise. Resort to legislative history—the factors which prompted the rule—is necessary only when the statute is vague or ambiguous and clarification of the underlying intent is needed to assist interpretation of the language. [Citation.] The rape shield statute is neither vague nor ambiguous." *Sandoval*, 135 Ill. 2d at 170, 533 N.E.2d at 730-31.

Moreover, on the question of relevance, the Illinois Supreme Court found in *Sandoval* that evidence of the type of sexual activity which complainant may have engaged in with others was not sufficiently relevant to overcome the protection afforded by the rape shield statute, stating that "[w]e note, however, that the testimony which Sandoval wished to introduce *** was not relevant to the matter being tried. The testimony would have added no information which could have helped the jury decide whether or not the complainant had been forced to have sex with the defendant *on this occasion*." (Emphasis in original.) (*Sandoval*, 135 Ill. 2d at 180-81, 533 N.E.2d at 735-36.) The court stated further that this is precisely what the statute sought to prevent, a diversion of the attention away from the accusations against the defendant. (*Sandoval*, 135 Ill. 2d at 176, 552

N.E.2d at 733.) In this case there was clear and overwhelming evidence in the record to establish an assault by this defendant on the complainant on the day in question. As in *Sandoval*, evidence of other possible assaults on other days was too remote and diversionary to warrant a breach of the protection afforded by the rape shield statute. Whatever relevance such testimony may have had in showing what could have accounted for the semen in the complainant's vagina after complainant on cross-examination admitted to a previous denial of its attribution to the defendant was substantially eliminated when the counts which charged the defendant with vaginal assault were dropped.

Defendant contends that the questions were necessary to complete his impeachment of the victim. He points out that M.M. contradicted her direct testimony that vaginal penetration had occurred when she testified on cross-examination that she told the police officers that no penetration occurred. The defendant argues that this contradiction, when coupled with the medical testimony that semen was present in M.M.'s vagina, served to lessen M.M.'s credibility, and the defense was merely completing its impeachment. However, in view of the fact that the complainant herself admitted her prior inconsistency on cross-examination and in view of the fact that the court recognized that inconsistency and directed a verdict in favor of the defendant on the counts affected by that inconsistency, there was little to be served by any further pursuit to justify overriding the protection of the rape shield statute.

We further note that even if this line of questioning should have been allowed, the defendant failed to make an adequate offer of proof at trial and has therefore waived the question of whether the trial court erred in excluding this evidence. (*People v. Wilder* (1986), 146 Ill. App. 3d 586, 496 N.E.2d 1183.) Here, the defendant made no offer of proof as to who may have assaulted M.M. or when or where such other attacks may have occurred. Furthermore, in light of the overwhelming evidence corroborating the victim's testimony, including defendant's admission that he was with the victim on the night in question and his incriminating statements made to Sergeant Pates and the stipulated medical testimony, we find that any error which may have occurred was harmless.

■■ Defendant's next claim of error is that his motion to exclude the admission of his prior convictions should have been granted. The standard which must be met for prior convictions to be admissible for impeachment was set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. Prior convictions may be admitted if (1) the

prior offense was punishable by imprisonment in excess of one year or involved dishonesty, and (2) if either the conviction or the release from confinement occurred within the preceding 10 years. If these two requirements are met, then the trial judge must weigh the prejudicial value of admitting the convictions against their probative value, and exclude them unless the probative value substantially outweighs their prejudicial value. (47 Ill. 2d 510, 268 N.E.2d 695.) While the trial court need not spell out its reasons for allowing prior convictions for impeachment, the record must indicate the court actually applied the balancing test. *People v. Ellison* (1984), 123 Ill. App. 3d 615, 631, 463 N.E.2d 175, 186-87.

■■ Here, both convictions meet the first two requirements for admissibility. The question which defendant raises on appeal is whether the trial court correctly balanced their probative value against their prejudicial value. We find that it did, noting that in denying defendant's motion, the judge said explicitly "I believe they are more probative than prejudicial." When the trial court does not expressly evaluate each of the balancing factors set forth in *Montgomery*, we must assume that the trial judge gave the appropriate consideration to the relevant factors (*People v. Purnell* (1984), 129 Ill. App. 3d 253, 472 N.E.2d 183), and we will not reverse its ruling absent a clear abuse of discretion. (*Ellison*, 123 Ill. App. 3d at 631, 463 N.E.2d at 187.) We do not find that a clear abuse of discretion has been shown.

■■ Defendant's final basis of error at trial is that he was not proven guilty beyond a reasonable doubt since the victim's testimony was not credible and there was insufficient corroboration. It has been said, and both parties to this appeal argue, that a conviction of aggravated criminal sexual abuse will be upheld if the testimony of the complaining witness is clear and convincing or if the testimony is corroborated by some other evidence, fact, or circumstance of the case. (*People v. Priola* (1990), 203 Ill. App. 3d 401, 413, 561 N.E.2d 82, 91.) However, notwithstanding the fact that the parties before this court argue only whether M.M.'s testimony was clear and convincing and corroborated, the clear and convincing standard has been held not to alter the standard of review in a criminal case, *i.e.*, whether, when viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all the elements of the crime beyond a reasonable doubt. (See *People v. Hart* (1991), 214 Ill. App. 3d 512, 520 (and cases cited therein).) We find that, under the facts in this case, there was sufficient evidence regardless of which standard is applied.

To be considered "clear and convincing," the victim's testimony need not be uncontradicted, unimpeached or crystal clear. If such imperfections do exist, they may raise a question of credibility to be resolved by the trier of fact, but do not necessarily prevent the testimony from being considered "clear and convincing." Testimony is clear and convincing if it is consistent, and if any discrepancies which may exist do not detract from its reasonableness. *People v. Priola* (1990), 203 Ill. App. 3d 401, 412-13, 561 N.E.2d 82, 91.

Here, the victim's testimony was clear and convincing. The only inconsistency apparent from the record before us related to the charge involving vaginal penetration. M.M. testified on direct examination that penetration had occurred, but on cross-examination she said she told the police officers that no penetration took place. This discrepancy was noted by the court, as it granted the defendant a directed verdict on the two counts relating to vaginal penetration. In addition, ample other evidence corroborated her testimony. First, there are the defendant's own statements to Officer Pates. Pates testified that defendant responded "I didn't know I hurt her" when advised of the rectal reconstructive surgery performed on the victim. Pates also testified that when he suggested to the defendant that he might need some help if he thought having sex with a 10-year-old girl was helping her, defendant said yes, he might need some help. Secondly, there was the in-court testimony of the defendant in which he admitted that M.M. was with him at his brother's house on the night in question, although denying that any sexual assault occurred. There was also the testimony of Officer Kibort as to M.M.'s ability to direct her to the house where the incident occurred. And there was a stipulation as to medical evidence regarding M.M.'s injuries and the reconstructive surgery necessary to repair those injuries.

Based on our review of the record, the evidence amply supports a finding that M.M.'s testimony was clear and convincing, as well as being corroborated by other evidence. As the stricter standard has been met, it follows *a fortiori* that the traditional criminal standard of review has also been satisfied.

### III. SENTENCING

The final issues on appeal concern sentencing. Specifically, the defendant contends that (1) the court erred in imposing consecutive sentences for aggravated criminal sexual assault and aggravated kidnapping; (2) the court erred in entering judgment and imposing sentence on five counts of aggravated criminal sexual assault since all arose from the same physical act, and one of the counts on which

judgment was entered and sentence imposed had previously been directed out; (3) the imposition of maximum extended terms was erroneous since the offense was not "exceptionally brutal and heinous"; (4) the conviction and sentence for unlawful restraint should be vacated because it is a lesser included offense of aggravated kidnapping; and (5) the conviction for aggravated battery should be vacated as it arose from the same physical act as the aggravated criminal sexual assault conviction.

In order to address the specific errors alleged by the defendant, it is necessary to detail the charges as set forth in the indictment:

Count I. "Aggravated criminal sexual assault, in that he committed an act of sexual penetration, upon [M.M.], to wit: an intrusion in that he inserted his penis into [M.M.]'s mouth, and he knew that [M.M.] was unable to understand the nature of the act, and caused bodily harm to [M.M.] by causing injury to the anus, in violation of chapter 38, section 12—14—a(2), of the Illinois Revised Statutes 1983, as amended."

Count II. "Aggravated criminal sexual assault, in that he committed an act of sexual penetration, upon [M.M.], to wit: an intrusion in that he inserted his penis into [M.M.]'s anus, and he knew that [M.M.] was unable to understand the nature of the act, and caused bodily harm to [M.M.] by causing injury to the anus, in violation of chapter 38, section 12—14—a(2), of the Illinois Revised Statutes 1983, as amended."

Count III. "Aggravated Criminal Sexual Assault in that he was seventeen years of age or over and committed an act of sexual penetration, upon [M.M.], to wit: contact between Larry Bell's penis and [M.M.]'s vagina, and [M.M.] was under thirteen years when the act of sexual penetration was committed, in violation of chapter 38, section 12—14—b(1), of the Illinois Revised Statutes 1983, as amended."

Count IV. "Aggravated Criminal Sexual Assault in that he was seventeen years of age or over and committed an act of sexual penetration, upon [M.M.], to wit: an intrusion in that he Larry Bell inserted his penis into [M.M.]'s mouth, and he knew that [M.M.] was unable to understand the nature of the act, and [M.M.] was under thirteen years when the act of sexual penetration was committed, in violation of chapter 38, section 12—14—b(1), of the Illinois Revised Statutes 1983, as amended."

Count V. "Aggravated Criminal Sexual Assault in that he was seventeen years of age or over and committed an act of sexual penetration, upon [M.M.], to wit: an intrusion in that he Larry Bell inserted his penis into [M.M.]'s anus, and he knew that [M.M.] was un-

able to understand the nature of the act, and [M.M.] was under thirteen years when the act of sexual penetration was committed, in violation of chapter 38, section 12—14—b(1), of the Illinois Revised Statutes 1983, as amended."

Count VI. "Unlawful restraint in that he knowingly without legal authority detained [M.M.] in violation of chapter 38, section 10—3—a of the Illinois Revised Statutes 1983, as amended."

Count VII. "Aggravated kidnapping in that he knowingly and secretly confined [M.M.] a child under the age of thirteen years, against her will, in violation of chapter 38, section 10—2—a(2) of the Illinois Revised Statutes 1983, as amended."

Count VIII. "Kidnapping in that he, knowingly and by force carried [M.M.] from one place to another with intent to secretly confine her against her will, in violation of chapter 38, section 10—1—a(2) of the Illinois Revised Statutes 1983, as amended."

Count IX. "Aggravated Battery in that he, in committing a battery on [M.M.] intentionally and knowingly without legal justification caused great bodily harm to said [M.M.] by causing injury to the anus, in violation of chapter 38, section 12—4—a of the Illinois Revised Statutes 1983 as amended."

Count X. "Aggravated Battery of a child in that he, a person over the age of eighteen years, intentionally and knowingly and without legal justification, caused great bodily harm to [M.M.] a child under the age of thirteen years, by causing injury to the anus, through acts of aggravated criminal sexual assault, in violation of chapter 38, section 12—4.3—a of the Illinois Revised Statutes 1983 as amended."

Count XI. "Aggravated criminal sexual assault in that he committed an act of sexual penetration, upon [M.M.], to wit: contact between Larry Bell's penis and [M.M.]'s vagina, and he knew that [M.M.] was unable to understand the nature of the act, and caused bodily harm to [M.M.] by causing injury to the anus, in violation of chapter 38, section 12—14—a(2) of the Illinois Revised Statutes 1983 as amended."

 Defendant's first contention of error in regard to sentencing is that he should not have received consecutive sentences for aggravated criminal sexual assault and aggravated kidnapping. He contends that the factors which may justify consecutive sentences under section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4) are not present in this case. Specifically, he contends that M.M.'s injuries were not severe. The statute provides in relevant part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct

during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).)

There is no dispute that one of the offenses here, aggravated criminal sexual assault, is a Class X felony. Defendant, however, argues that although M.M. spent six days in the hospital for reconstructive surgery on her rectum, her injuries were not permanent and therefore not severe. We find no support for the contention that to be severe, injuries must be permanent.

Moreover, as the State points out, another basis upon which a court may impose consecutive sentences involves the protection of the public. Section 5—8—4(b) provides:

"The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).)

Here, the court stated "This is a young child. You are a man. You are a man who knows about these types of acts because you have been there before. You have been convicted before." In addition, the court certified the defendant to be a habitual child sexual offender, based on this conviction and prior conviction of attempted rape and indecent liberties with a child. Although the trial court did not specifically refer to section 5—8—4(b) in making these comments, these facts clearly could form the basis for imposing consecutive sentences in the interest of protecting the public.

It is within the discretion of the trial court to determine whether multiple sentences are to be served concurrently or consecutively. The decision will not be disturbed absent an abuse of discretion. (*People v. Paino* (1985), 137 Ill. App. 3d 645, 653, 484 N.E.2d 1106, 1112.) For the reasons discussed above, we find no such abuse of discretion here.

■■■ We do, however, find that the court erred in entering judgment and imposing sentences on five counts of aggravated criminal sexual assault. As discussed earlier, at the close of the State's case, the defendant was granted directed verdicts on counts III and XI. However, at the end of trial, the judge stated "I believe the State has proved by fair and convincing evidence each and every charge aside

from the one charge that was dismissed. There are nine of them left, two counts of aggravated criminal sexual assault, another two counts of aggravated criminal sexual assault, another count of aggravated criminal sexual assault. *** On all of those charges there will be a finding of guilty, judgment on the finding." At sentencing, the court entered sentences on five counts of aggravated criminal sexual assault, counts I, II, III, IV and V. Clearly, the judgment and sentence on count three was in error, as the court had earlier granted defendant a directed verdict on that count. Therefore, the judgment and sentence on count III are vacated.

Moreover, we find that the convictions and sentences on counts II and V cannot both stand since they arise from the same physical act. In *People v. Segara* (1988), 126 Ill. 2d 70, 533 N.E.2d 802, the Illinois Supreme Court considered a case similar to the present one. In *Segara*, the defendant had been found guilty of eight counts of aggravated criminal sexual assault. After the appellate court vacated all but one of the counts, the supreme court considered the conditions under which multiple convictions may be permitted. It reasoned that when several acts have been committed, although the acts are interrelated, multiple convictions may stand. However, if the same physical act forms the basis for more than one offense, only one conviction and sentence may be imposed. Here, counts II and V involve the same physical act and penetration. Under the holding of *Segara* only one conviction may stand. As did the court in *Segara*, we remand for clarification as to which count shall be retained.

The defendant, however, argues further that since the entire offense involved one continuing course of conduct, all but one conviction and sentence for aggravated criminal sexual assault should be vacated. With this argument we disagree. The remaining two counts, I and IV, aside from the counts involving anal penetration discussed above, involve oral penetration. Again we turn to *Segara* for direction. In finding that two convictions for aggravated criminal sexual assault were permissible when two distinct acts occurred in the same place over a period of time, the court said "[t]o permit a defendant to rape an individual several times over a period of time in the same place with little or no break between each act deprecates the heinous and violent nature of each act and the effect each act has upon the victim. Defendant committed two acts each of equal value (Class X felonies) and appropriately may be prosecuted and convicted for each act." (*Segara*, 126 Ill. 2d at 77, 533 N.E.2d at 805.) Here, the defendant committed two separate acts of oral penetration. The first occurred in the bedroom immediately upon entering the house; the sec-

ond occurred later after they had redressed and gone into the living room. Accordingly, we find no error in the convictions and sentences on counts I and IV.

■■■ Defendant's third contention of error in sentencing relates to the imposition of maximum extended terms for the aggravated criminal sexual assault convictions. He argues that the only basis upon which the court could have enhanced the sentences was a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty, and that the facts do not support such a finding. We disagree, both with his assertion that brutal or heinous behavior is the only possible enhancement factor and with his assertion that the facts do not indicate such behavior.

The imposition of extended sentences is governed by statute. Section 5—8—2 (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2) provides that extended terms may be imposed if aggravating factors are found to be present. The aggravating factors are set forth in section 5—5—3.2 (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2), which provides in part:

> "(b) the following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:
>
> (1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or
>
> (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; or
>
> (3) When a defendant is convicted of any felony committed against:
>
> (i) a person under 12 years of age at the time of the offense."

Although the trial court did not specifically state which factor or factors in aggravation it based its extended sentences upon, we note that it did make several comments which could be construed to correspond to the factors listed above. (See *People v. Lucas* (1989), 132 Ill. 2d 399, 445, 548 N.E.2d 1003, 1022 (lack of express findings does not result in the sentence being unreviewable).) In reviewing a sentencing hearing, the object is ascertainment of any aggravating factors proven beyond a reasonable doubt. (132 Ill. 2d at 445, 548 N.E.2d

at 1022.) It noted that the defendant had been convicted before, the crime was violent and heinous, and the victim was a young child. Thus, contrary to the defendant's assertion, brutal and heinous behavior is not the only possible factor.

It is true, as defendant contends, that the age of the victim may not be used as an aggravating factor when the offense is based on the victim's age. However, we note that not all of the offenses of which the defendant was found guilty and sentenced are based on the age of the victim. Counts I and II are based upon section 12—14(a)(2), which rests upon the accused causing bodily harm to the victim. (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2).) On those counts, the age of the victim would be a proper aggravating factor. (See *People v. Campos* (1987), 155 Ill. App. 3d 348, 360-61, 507 N.E.2d 1312, 1350-51.) Counts IV and V were under section 12—14(b)(1), which is predicated on the victim's age. On those counts, age would not be a factor to be considered in aggravation. (155 Ill. App. 3d at 360-61, 507 N.E. at 1350-51.) The existence of other possible factors in aggravation, however, could justify an extended sentence on those counts.

The imposition of an extended sentence is a matter of judicial discretion and will not be overturned absent an abuse of that discretion. (*People v. Strait* (1983), 116 Ill. App. 3d 110, 451 N.E.2d 631.) Considering the record before us and the comments made by the trial court at sentencing, we do not believe there has been such an abuse here as regards the extended sentences for the aggravated criminal sexual assault charges.

■ We do, however, find error in the imposition of a 30-year sentence on the charge of aggravated kidnapping. An extended-term sentence may be imposed only for offenses within the most serious class of offenses of which the accused is convicted. (*People v. Jordon* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) Here, the aggravated criminal sexual assault charges are Class X felonies. Aggravated kidnapping is a Class 1 felony. Therefore, imposition of an extended-term sentence on that charge was in error. Accordingly, we vacate the sentence on count VII and remand for resentencing on the aggravated kidnapping charge.

■ Defendant's next basis of appeal is that his conviction and sentence on count VI for unlawful restraint should be vacated because it is a lesser included offense of count VII for aggravated kidnapping. We agree with him on this point. It is clear that a person cannot be convicted of more than one offense arising from the same physical act. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Unlawful restraint has been held to be a lesser included offense of aggravated

kidnapping. (See *People v. Hopkins* (1982), 107 Ill. App. 3d 422, 437 N.E.2d 722.) Here, both charges were based upon the detention or confinement of M.M. We therefore vacate the conviction and sentence on count VI for unlawful restraint.

The final issue raised by defendant concerns his conviction for aggravated battery, count IX, which he contends should be vacated because it arose from the same physical act as the aggravated criminal sexual assault convictions. Again relying on *King*, we agree with defendant, and vacate his conviction and sentence for aggravated battery.

Finally, we observe that it appears from the record that no judgment or sentence was entered on count X for aggravated battery of a child. The trial court, at the conclusion of the trial, said that the State had proved all the remaining charges, yet it did not enter a verdict on the aggravated battery of a child count. However, we see no need to address this omission in this appeal since the State did not choose to raise it by cross-appeal or otherwise. Moreover, the defendant specifically noted in his brief that he was making no argument concerning this count since no judgment or sentence was entered.

Conclusion

For the reasons hereinabove set forth, the judgments and sentences of the circuit court on counts I and IV of the indictment are affirmed. The judgments and sentences on counts III, VI and IX are vacated. As to count VII, we confirm the conviction and remand for resentencing. As to counts II and V, the judgments and sentences on those counts are remanded for clarification as to which shall be retained.

Affirmed in part; vacated in part and remanded in part.

LORENZ, P.J., and MURRAY, J., concur.