THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONNIE L. TODD, Defendant-Appellant.

Fourth District   No. 4—91—0608

Opinion filed February 11, 1993.

Daniel D. Yuhas and Gloria Ann Morris, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Leslie Hairston, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In March 1991, a jury found defendant, Ronnie Todd, guilty of three counts of criminal sexual assault in violation of section 12—13(a)(3) of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(3)). In May 1991, trial court sentenced defendant to three consecutive four-year prison terms. Defendant appeals, arguing that (1) the trial court improperly precluded him from presenting evidence regarding the victim's alleged fear of pregnancy; (2) the trial court erred in instructing the jury; (3) the prosecutor's improper closing argument denied him a fair trial; (4) the trial court erred by sentencing him to prison instead of probation; and (5) the trial court erred in sentencing him to consecutive prison terms.

We affirm.

## I. BACKGROUND

On September 27, 1990, B.T., a 16-year-old girl and the victim in this case, told her aunt that defendant, B.T.'s adoptive father and (previously) stepfather, was having sex with her. At her aunt's request, B.T. also told her mother. B.T.'s mother then called the police, relaying B.T.'s allegations to them. In October 1990, the State charged defendant with three counts of criminal sexual assault of B.T., alleging that defendant committed acts of sexual penetration with B.T.—a "family member" under 18 years of age—by placing his penis in her vagina, by placing his penis in her mouth, and by placing his mouth on her vagina. Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(3).

At defendant's March 1991 trial, B.T. testified that during the late summer or early fall of 1989, defendant began touching her clothing on her breasts, bottom, and vaginal area. F   ˙uld touch her while

they were alone in their home or garage. He also would have her touch his clothing on the outside of his bottom and penis. She testified that this touching eventually led to touching underneath each other's clothing in the same areas.

B.T. testified that later in this same time period, defendant began taking her out alone for driving lessons about two or three times a week. Defendant would drive their family Buick out of Champaign onto some nearby country roads at about dusk. He would then stop near or between cornfields as nightfall came. Initially on these trips, he would touch her on top of her clothes and then under her clothes. Defendant later started performing oral sex upon her and having her perform oral sex upon him. She stated that he also attempted to penetrate her vagina with his penis. However, defendant could not completely penetrate her until about one month after the first attempt. Upon the first complete penetration, she testified that she bled.

In December 1989, B.T. had surgery to remove a cyst from an ovary. She testified that this surgery interrupted the sexual activity, including sexual intercourse, for only about two weeks after the surgery even though she had been advised not to engage in sexual intercourse until six weeks after the operation. Otherwise, the pattern of the driving lessons and the concurrent sexual activity in the car continued until she obtained her driver's license in January 1990. After receiving her license, the driving lessons stopped, but defendant then began having sex with her at their home.

B.T. testified that defendant would arrange these sexual encounters while her mother was at work, in the shower, or asleep, even though her younger brother would also be in the house. The family members residing at their home in Champaign at the time were defendant, B.T.'s mother, B.T., and B.T.'s younger brother. K.T., defendant's son and B.T.'s stepbrother, resided with the family from May 1989 through February 1990, when he moved out because of friction in the family's relationships. Defendant and B.T.'s mother shared a bedroom, and B.T.'s bedroom adjoined their bedroom through a common bathroom between the bedrooms. Defendant installed locks on these bedroom doors, and the sexual encounters typically occurred in defendant's bedroom after defendant had locked both defendant's and B.T.'s bedroom doors. Because defendant had a flexible work schedule, he could have sex with B.T. when she came home from school before B.T.'s mother returned from work and before defendant left for work around 4 p.m. B.T. added that defendant used a vibrator on her a few times during these sexual encounters. She further testified that defendant would sometimes also shave his pubic area be-

cause he said that it would be "smoother," and that defendant's goal was for her to climax.

In March 1990, defendant and B.T.'s mother bought a 1990 Ford Probe. B.T. testified that at first defendant told her that the car was a birthday present for her. However, when they were alone together, he told her, in reference to the car and their sexual activity, that his motto was "if you give a little, you get a little." He later told her that it was for family use, but she still primarily used it.

In April 1990, defendant had a heart attack and was hospitalized, at which time he received an angiogram. The angiogram required the insertion of a tube into an artery in defendant's leg in the groin area and then injecting a dye into his artery. B.T. testified that soon after defendant came home from the hospital and while they were alone together, defendant pulled down his pants and showed her the bruise in his leg that resulted from the angiogram. He then had sexual intercourse with her. She testified that while his ejaculate normally appeared white, it had an orange or yellow tint for a brief time after he returned home from the hospital. Defendant told her that the dye which was injected into his body during the angiogram caused this coloration. She also testified that the bruise on his leg got much bigger and darker before it eventually faded away.

Regarding the events of September 27, 1990, B.T. testified that she had to stay after school to make up a math test. She was later informed that she had to take two make-up tests. After taking both tests, she drove a friend home and then went home herself, arriving at about 4:30 p.m. Upon arriving home, defendant became very upset and angry with her because he thought she was lying. Defendant then took the keys to the Ford Probe away from B.T. Additionally, B.T. had asked the previous night if she could go to an upcoming homecoming dance. Defendant initially refused to let her go, but later declined to give a firm answer. B.T. testified that after these events she was "sick of taking it, so *** something inside me told me that I needed to tell [about the sexual activity with defendant]."

B.T. testified on cross-examination that defendant was the only person with whom she had had sexual intercourse. When asked how many times defendant had had sex with her, she responded that it was "too many times to count." She also noted that defendant would always ask her when her menstrual cycle occurred, when it ended, and how long it lasted. When she would not have it for a while, defendant would ask her if she was pregnant, despite his having told her that he had a vasectomy and could not impregnate her. On cross-examination, she denied that she had told defendant or K.T. that she

feared being pregnant because somebody had raped her. However, the trial court sustained the State's objections to further defense counsel cross-examination of B.T. concerning (1) whether she had had any sexual encounters with K.T.; (2) whether she had told K.T. that her cousin had raped her; and (3) whether she told K.T. that she feared being pregnant after this alleged activity with her cousin.

Defendant denied any sexual activities with B.T. Defendant testified that he bought the Ford Probe for his wife (B.T.'s mother), intending that B.T. would then use the old Buick. However, because B.T.'s mother was afraid to drive the new Probe, only defendant and B.T. drove it, although B.T. primarily drove it. Defendant denied that he bought the car as a reward to B.T. for sexual favors.

Defendant also testified that B.T. had approached him and expressed fear that she might be pregnant. However, the trial court refused to allow defense counsel to further pursue this line of questioning. Defendant then sought to have his stepson K.T. testify in his defense, but the trial court refused his proffered testimony. The court ruled K.T.'s testimony collateral and violative of the rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7).

The State also presented evidence that after the events on September 27, B.T.'s mother and her two children immediately moved out of the house they had shared with defendant and had no further contact with defendant. At the end of October 1990, defendant sent some photographs to B.T.'s mother which included several pictures of B.T. with an "X" written across her face. As stated above, the jury subsequently found defendant guilty on all three counts of criminal sexual assault.

## II. ANALYSIS

### A. *Preclusion of Defendant's Evidence Regarding the Victim's Alleged Fear of Pregnancy*

Defendant first argues that he was denied his right of confrontation under the sixth amendment of the United States Constitution and article I, section 8, of the Illinois Constitution because the trial court precluded him from presenting all of the evidence he wished regarding his fear that B.T. might have been pregnant. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8.) Defendant claims that this denial turned his statement to B.T. that he was concerned that she might be pregnant into an implicit admission of guilt. According to defendant, the implicit admission was created when B.T. testified on cross-examination that she had sex only with defendant. We discern from defend-

ant's argument that, essentially, he contends that because he was prevented from eliciting or presenting evidence on whether B.T. had sex with persons other than him, the jury likely concluded that he was the only person to have sexual contact with B.T. Thus, it also likely concluded that because B.T. had no other sexual partners, defendant could have made the statements to B.T. of his concern of B.T.'s possible pregnancy only if he was having sex with B.T.—the "implicit admission."

During trial, defendant attempted three times to explain that his concern over B.T.'s pregnancy arose out of her sexual activity with others: first, during cross-examination of B.T.; second, during his own testimony; and third, by offering K.T. as a witness who would testify that B.T. told him that she feared that her cousin had impregnated her when he raped her. Although the trial court allowed defense counsel to briefly cross-examine B.T. about these matters, it did not allow defendant to testify on this subject and did not allow K.T. to testify at all, holding such testimony would violate the rape shield statute (Ill. Rev. Stat. 1989, ch. 38, par. 115—7).

Defendant's claims arise in the following context. On direct examination, B.T. mentioned nothing about any fear of pregnancy. However, on cross-examination, defense counsel asked her, "Isn't it correct that you told [K.T.] today that you feared you were pregnant as a result of [being raped by your cousin]?" The trial court sustained the State's objection to this question. Defense counsel then asked, "Isn't it correct that prior to that time you had told your father that you feared you were pregnant?" The trial court again sustained the State's objection to this question.

On redirect examination, the prosecutor responded to defense counsel's questioning by asking the following questions:

"Q. [B.T.], why were you discussing with your father whether or not you were pregnant?

A. Because he always asked when my period was[,] when it ended and the time span and everything. He had to know all the time. And then when he kept askin' me and I hadn't had it for awhile, then he brought up that I might be pregnant.

Q. That's when the suggestion came that you explained the pregnancy if you were pregnant?

A. Yes."

The prosecutor asked her nothing more about this matter. A few minutes later, defense counsel began his re-cross-examination as follows:

"Q. [B.T.], isn't it correct that the conversation you had with [defendant] about pregnancy was when you reported to him

that some individual \*\*\* had raped you and perhaps made you pregnant?

[State's Attorney:] Objection.

THE COURT: Well, you may answer.

A. No.

Q. Didn't you tell [K.T.] the same thing about your cousin today?

A. No.

[State's Attorney:] Objection.

THE COURT: The answer may stand."

Defense counsel then ended this inquiry and moved on to other matters. However, when defense counsel later attempted to follow up on this inquiry by presenting more evidence concerning B.T.'s alleged fear that someone other than defendant might have impregnated her, the trial court sustained the State's objection.

Defendant argues that the court erred when it ruled that the rape shield statute barred evidence regarding B.T.'s prior sexual contact with others. He asserts that he should have been allowed a limited rebuttal to B.T.'s testimony that she feared her possible pregnancy. This limited rebuttal would consist of the following evidence: (1) cross-examination of B.T. on her assertion that she never had sex with anyone other than defendant and on defendant's concern the B.T. might be pregnant; (2) defendant's testimony about how B.T. had approached him with concerns that she feared pregnancy because she had been raped by a boy and thereafter her menstrual cycle was late; and (3) K.T.'s testimony about how B.T. had told him that she had sex with his cousin, subsequently her menstrual cycle was late, and she feared pregnancy. Defendant concedes that his counsel made a broad offer of proof concerning B.T.'s sexual history to the trial court and argued the admissibility of that evidence because of its claimed effect on B.T.'s credibility. However, on appeal he now wants us to consider the issue of this evidence as necessary to rebut an "implicit admission."

Initially, we note that a defendant can preserve an issue for review only by both raising the issue at trial and in a written post-trial motion. (*People v. Pecoraro* (1991), 144 Ill. 2d 1, 17, 578 N.E.2d 942, 949; *People v. Jackson* (1992), 235 Ill. App. 3d 732, 741, 601 N.E.2d 1317, 1323.) Accordingly, the specific basis for admissibility of the proffered evidence that defendant seeks to raise on appeal must first be raised in the trial court. Defendant's failure to do so waives the issue on appeal. *People v. Grant* (1992), 232 Ill. App. 3d 93, 105, 596 N.E.2d 813, 822.

Defendant here did not raise this "implicit admission" argument at trial, arguing instead that the evidence was admissible to impeach B.T.'s credibility. However, defendant claims that this court should review his "implicit admission" claim as plain error because the waiver rule is relaxed when a fundamental constitutional right is at stake, such as his right to confront witnesses. (See *People v. Simms* (1991), 143 Ill. 2d 154, 170, 572 N.E.2d 947, 953; *People v. Loferski* (1992), 235 Ill. App. 3d. 675, 684, 601 N.E.2d 1135, 1141.) Defendant asserts that because the jury *could have* construed his statements as an implicit admission, the trial court's error in limiting rebuttal evidence constituted plain error that requires reversal.

■ We disagree with defendant's contention that he was denied his constitutional right to confront witnesses. We also disagree with defendant's claim that the trial court's preclusion of his proffered evidence left the jury with his "implicit admission" (whatever that is). Instead, we view defendant's proffered evidence as nothing more than a poorly veiled attempt to avoid the prohibitions of the rape shield statute and "dirty up" B.T.

The rape shield statute provides, in pertinent part, as follows:

"In prosecutions for *** criminal sexual assault, *** the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1989, ch. 38, par. 115—7(a).)

In *People v. Sandoval* (1990), 135 Ill. 2d 159, 170-71, 552 N.E.2d 726, 730-31, the Illinois Supreme Court stated the following regarding the rape shield statute:

"The language of the statute *** is concise and precise. *** The rape shield statute is neither vague nor ambiguous. We note that the statute does not limit its proscription to a defendant's attempts to introduce evidence of the victim's prior sexual encounters; the statute says quite simply that 'the prior sexual activity *** is inadmissible.' (Ill. Rev. Stat. 1987, ch. 38, par. 115—7(a).) *** [T]he *exception* addresses only the 'past sexual conduct of the alleged victim with the accused.' Ill. Rev. Stat. 1987, ch. 38, par. 115—7(a).

* * *

*** The language of the statute *** leaves no room for introduction of reputation or specific-act evidence from any party in the action." (Emphasis in original.)

Thus, as construed by the Illinois Supreme Court, the rape shield statute unequivocally proscribes the admission of the proffered evi-

dence here of B.T.'s prior sexual conduct. (See *People v. Bell* (1991), 217 Ill. App. 3d 985, 1004, 577 N.E.2d 1228, 1242.) The proffered evidence—B.T.'s alleged comments about her fear of pregnancy by someone other than defendant—directly relates to her prior sexual activity with someone other than defendant and is therefore inadmissible under the rape shield statute.

Nevertheless, defendant argues that applying the rape shield statute here denied him his right to confront witnesses because the result was to leave the jury with his "implicit admission." Citing *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, defendant asserts that the rape shield statute cannot bar his sixth amendment right to impeach B.T. by attacking her credibility concerning the crime charged. In so arguing, defendant entirely ignores the discussion and analysis of *Davis* by the Illinois Supreme Court in *Sandoval*, when that court wrote the following:

> "With the *Davis* decision, the Court does not present the defense with a blanket invitation to attack a witness. Rather, *Davis* limits such an attack to situations where the *confrontation is both relevant and based on a showing of bias, prejudice or motive. Thus, Davis stands for the proposition that not even a statute can be used to shelter a witness whose motive, prejudice or bias may affect testimony before the court.* [(Emphasis added.)] The emphasis of *Davis* was not to *create* an exception to the statutory protection, but to *prevent* the statute from creating an exception to the well-settled and accepted admissibility of the motive, bias or prejudice of a particular witness." (Emphasis in original unless otherwise specified.) *Sandoval*, 135 Ill. 2d at 174-75, 552 N.E.2d at 733.

Defendant claimed that he did not commit the alleged sexual conduct with B.T. that she testified about. When testimony conflicts, the jury must determine whom to believe. To assist the jury in that determination, the court instructs the jury on factors it might consider. (See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (3d ed. 1992) (hereinafter IPI Criminal 3d).) However, for the reasons discussed in *Sandoval*, B.T.'s credibility *cannot* be attacked by evidence of her alleged sexual history with someone other than defendant. *Sandoval*, 135 Ill. 2d at 171, 552 N.E.2d at 731; Ill. Rev. Stat. 1989, ch. 38, par. 115—7(a).

As the supreme court noted in *Sandoval*, defendant here appears to be "attempting to do precisely what the rape shield statute was enacted to prevent: to divert the jury's attention from the accusation against him." *Sandoval*, 135 Ill. 2d at 176, 552 N.E.2d at 733; see

also *Bell*, 217 Ill. App. 3d at 1006, 577 N.E.2d at 1244 (evidence of other possible assaults is too remote and diversionary to warrant a breach of protection afforded by the rape shield statute).

Even if the rape shield statute did not prohibit defendant's proffered evidence about B.T.'s alleged sexual history, we would nonetheless hold that the trial court properly excluded that evidence because it related only to a collateral matter and therefore could not have impinged upon defendant's right to confrontation. A witness cannot be impeached on collateral evidence (see *Sandoval*, 135 Ill. 2d at 181, 552 N.E.2d at 736; *People v. Fonza* (1991), 217 Ill. App. 3d 883, 887, 578 N.E.2d 8, 12); because a complainant's prior sexual history is collateral evidence, it is irrelevant in a sexual assault trial. *Sandoval*, 135 Ill. 2d at 181, 552 N.E.2d at 736.

Defendant's attempt to present evidence concerning B.T.'s expressed fear of pregnancy was nothing more than an attempt to "dirty up" B.T. by bringing out her sexual history. However, her alleged sexual history had nothing to do with defendant's defense—his denial that he committed these acts with B.T. No issue existed at trial regarding whether B.T. was ever pregnant—or if she was, who the father was—until defendant brought the matter up in cross-examination and then further explored it in re-cross-examination. In short, B.T.'s feared pregnancy was a collateral matter that did not address the question of whether defendant had sex with B.T.

The answer a witness gives on cross-examination to a collateral matter—here, B.T.'s statement that she had sex only with defendant— must be accepted by the questioner without further elaboration. (*Sandoval*, 135 Ill. 2d at 194, 552 N.E.2d at 742.) Accordingly, defendant must accept B.T.'s negative responses and the possible consequences flowing therefrom, including that the jury might find an "implicit admission" from this testimony.

The reception of collateral evidence intended to affect a witness' credibility rests within the trial court's discretion, and a reviewing court will not disturb its decision absent an abuse of that discretion. (*People v. Printy* (1992), 232 Ill. App. 3d 735, 745, 598 N.E.2d 346, 354.) Under the confrontation clause, the court's focus should be on whether adequate facts have been presented to the jury so that it can determine a witness' credibility, not on the specific limitation placed on the cross-examination. (*People v. Collette* (1991), 217 Ill. App. 3d 465, 468, 577 N.E.2d 550, 553 (scope of cross-examination is not unlimited; when evidence is only marginally relevant, a court may impose restrictions).) Based on our review of the overall evidence presented at trial, especially B.T.'s testimony and defense counsel's

ability to cross-examine B.T. on relevant matters, we find that the trial court neither abused its discretion nor denied defendant his constitutional right of confrontation.

### B. *Jury Instructions Omitted on Mental State Element*

Defendant next argues that his conviction must be reversed because the jury instructions for criminal sexual assault did not include a mental state, namely, the definitional instructions for criminal sexual assault and sexual penetration as well as the issues instruction for criminal sexual assault (see IPI Criminal 3d Nos. 11.55, 11.65E, 11.56). However, defendant waived this issue for review because he failed to object at trial or in his post-trial motion. We also find that the instructions given do not constitute plain error. (See *People v. Smith* (1991), 209 Ill. App. 3d 1043, 1061, 568 N.E.2d 482, 493.) We have previously ruled that a mental state need not be specified when instructing the jury on the elements of aggravated criminal sexual assault. (*Smith*, 209 Ill. App. 3d at 1061, 568 N.E.2d at 493; *People v. Burton* (1990), 201 Ill. App. 3d 116, 122, 558 N.E.2d 1369, 1373-74.) We now extend this ruling to hold that a mental state need not be specified when instructing the jury on the elements of criminal sexual assault. See *People v. Mason* (1991), 219 Ill. App. 3d 76, 82, 578 N.E.2d 1351, 1356.

### C. *Prosecutor's Closing Argument*

Defendant also contends that the prosecutor committed reversible error during closing argument. He claims that during the State's closing argument, the State attempted to bolster its case with medical evidence that was never presented at trial. The State's argument at issue is the following:

> "[Defense counsel] has talked about corroboration. One of the things he mentioned is we had no medical testimony that showed that [B.T.], in a physical examination, had a vaginal canal that was wide open and a cervix that was easily examined. Do you really think that if [a doctor] made a determination that [B.T.] had a hymen still intact and apparently—."

At this point, defense counsel objected and the trial court sustained the objection. The prosecutor made no further comments along that line of argument.

At the hearing on defendant's post-trial motion, the trial court addressed the prosecutor's allegedly improper argument and stated the following:

"[The prosecutor], in his closing argument *** was getting into an area which was objectionable. And I think that before he even got very much past the threshold, there was an objection, and I sustained it, and the jury, at the very least in their written instructions, were instructed to disregard any such remarks or questions or responses to which objections were sustained. And I believe that was adequate protection, and that the problem was cured."

We agree with the trial court. The prosecutor never even completed the allegedly improper statement, further reducing any effect it could have had upon the jury. We also note that defendant never asked the court to specifically admonish the jury to disregard the prosecutor's statement. Therefore, without reviewing the propriety of the prosecutor's argument, we deem that argument of no moment in the context of the entire trial. See *People v. Smith* (1990), 199 Ill. App. 3d 839, 854, 557 N.E.2d 596, 607-08 (prosecutor's closing argument must be considered in the context of closing arguments from both parties).

### D. *Defendant's Sentence*

Defendant next argues that the trial court abused its discretion when it sentenced him to three consecutive four-year terms of imprisonment instead of probation. Defendant contends that because he was a hard-working man, had no prior criminal record, and had a history of health problems, the court should have sentenced him to probation.

Section 5—5—3(e) of the Unified Code of Corrections (Unified Code) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(e)), permits a court under certain circumstances to sentence a defendant convicted of criminal sexual assault of a family member to probation. Defendant contends that the trial court erred in not giving full consideration to whether probation was appropriate for defendant under the factors outlined in section 5—5—3(e) of the Unified Code. However, section 5—5—3(e) of the Unified Code does not *require* the court to sentence a defendant to probation, and the court's determination of this matter lies within its discretion. *People v. Houck* (1989), 185 Ill. App. 3d 585, 589, 541 N.E.2d 813, 815.

At the sentencing hearing, the trial court explained the sentences it imposed as follows:

"[T]here are certainly a number of things that *** would call for a sentence here to be mitigated. The fact, of course, first of all, that [defendant has] no prior criminal record; [and] that defendant has, apparently, always had an excellent record of employment. Those things, of course, do and should count heav-

ily in the court's thinking in any type of sentencing hearing. *** 

   ***

[However,] I view the consistency of the conduct over time, its calculated nature, *** the impact that it's had upon the victim, and I have to find that there is more here to aggravate a sentence *** than there is truly to mitigate [it].

I do believe under all of the circumstances, considering the nature and the circumstances of the offense, that a sentence to probation would deprecate the seriousness of the offense and the defendant's conduct. And I do believe under all the circumstances that a sentence to probation would be inconsistent with the ends of justice."

■ The sentencing judge is in the best position to make a first-hand, reasoned judgment on the appropriate sentence based on the particular circumstances and factors of each case. (*People v. Costello* (1992), 224 Ill. App. 3d 500, 510, 586 N.E.2d 742, 749; *People v. Black* (1992), 223 Ill. App. 3d 630, 633, 585 N.E.2d 1228, 1231.) The trial court has wide latitude in determining and weighing factors in mitigation or aggravation when exercising its discretion and imposing a sentence. (*People v. McCarthy* (1991), 213 Ill. App. 3d 873, 887-88, 572 N.E.2d 1219, 1228-29; see also *Costello*, 224 Ill. App. 3d at 510, 586 N.E.2d at 749 (fact that defendant is first-time offender is merely another mitigating factor).) The trial court's ruling is given great deference and weight on appeal (*People v. Taggart* (1992), 233 Ill. App. 3d 530, 560, 599 N.E.2d 501, 522), and a sentence which falls within the statutory guidelines will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense (*Costello*, 224 Ill. App. 3d at 510, 586 N.E.2d at 749). The record here reveals that the trial court properly considered all relevant mitigating and aggravating factors when it determined defendant's sentence, and we find no abuse of discretion in its sentencing defendant to three consecutive four-year prison terms instead of probation.

### E. *Mandatory Consecutive Sentences*

Last, defendant argues that the trial court incorrectly thought itself required under section 5—8—4(a) of the Unified Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a)) to impose consecutive prison sentences on each of defendant's convictions. The second to last sentence of section 5—8—4(a) of the Unified Code reads as follows:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct

during which there was no substantial change in the nature of the criminal objective, *unless,* one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, *or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively."* (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).

In *People v. Ewald* (1991), 210 Ill. App. 3d 7, 568 N.E.2d 451, this court held that section 5—8—4(a) of the Unified Code requires trial courts to impose consecutive prison sentences for multiple convictions under section 12—13 of the Criminal Code. Defendant argues that we should overrule *Ewald* because the Second District Appellate Court came to an opposite conclusion in *People v. Bole* (1991), 223 Ill. App. 3d 247, 585 N.E.2d 135, *appeal allowed* (1992), 144 Ill. 2d 636, 591 N.E.2d 24. The Fifth District Appellate Court agreed with our conclusion in *Ewald* (see *People v. Hough* (1991), 221 Ill. App. 3d 447, 582 N.E.2d 259), while the Third District Appellate Court agreed with *Bole* (see *People v. Dooley* (1992), 227 Ill. App. 3d 1063, 592 N.E.2d 1112).

■ In our judgment, however, the Illinois Supreme Court has resolved the differences between *Ewald* and *Bole.* In *People v. Wittenmyer* (1992), 151 Ill. 2d 175, 195-96, 601 N.E.2d 735, 744-45, the supreme court held the following:

"After carefully reviewing the plain language of [section 5—8—4(a) of the Unified Code], we believe that the legislature has provided for *two exceptions* to the general rule that a trial court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. First, if one of the offenses for which defendant was convicted was a Class X or Class 1 felony *and* the defendant inflicted severe bodily injury, the legislature has mandated that the trial court impose consecutive sentences. Second, if the defendant was convicted of a violation of section 12—13 or 12—14 of the Criminal Code, the legislature had mandated that the trial court must [also] impose consecutive sentences." (Emphasis in original.)

This interpretation upholds *Ewald* and tacitly rejects *Bole.* (See also *People v. Glass* (1992), 239 Ill. App. 3d 916, 930 (reaffirming this court's position in *Ewald*).) Accordingly, we hold that section 5—8—4(a) of the Unified Code requires a sentencing court to impose consec-

utive sentences for multiple convictions under section 12—13 of the Criminal Code. Because the jury convicted defendant of multiple violations of section 12—13 of the Criminal Code, consecutive sentences were required in this case. Therefore, we affirm the trial court's imposition of three consecutive four-year sentences upon defendant.

### III. Conclusion

For the reasons stated, we affirm defendant's convictions on all three counts and the trial court's imposition of three consecutive four-year sentences upon defendant.

Affirmed.

KNECHT and LUND, JJ., concur.